**Mary Sue POLASEK et al., Appellants,**

**v.**

**Susan QUINIUS, Appellee.**

**No. 11644.**

Court of Civil Appeals of Texas.

Austin.

March 5, 1969.

Rehearing Denied March 26, 1969.

Byrd, Davis, Eisenberg & Clark, Don L. Davis, Tom H. Davis, Clark, Thomas, Harris, Denius & Winters, Robert C. Mc-Creary, Austin, for appellants.

Alvis & Carssow, John F. Campbell, Austin, Thompson, Coe, Cousins & Irons, R. B. Cousins, Dallas, for appellee.

O'QUINN, Justice.

This is an intersection accident case.

Appellants are Mary Sue Polasek, plaintiff in the trial court, and Harry Man-

ners, intervenor, who brought this action against Susan Quinius, appellee, for personal injuries and property damages sustained in an automobile collision at an intersection of two streets in Austin, Texas. The trial court entered a take nothing judgment against appellants based on jury findings of contributory negligence.

Appellants on appeal bring fifteen points of error. Under points one through twelve appellants urge that jury findings of negligence on the part of plaintiff under several special issues are without support in the evidence and are against the great weight and preponderance of the evidence. The last three points of error are directed to failure of the trial court to give requested instructions on standard of care required in a sudden emergency, and, alternatively, requested issues with regard to the doctrine of imminent peril.

Appellee contends under two cross points of error that the trial court erred in not admitting defendant's evidence that failure of plaintiff to wear her seat belt was a causation of injury as well as an aggravation of injury. Under a third cross point appellee urges error of the trial court in setting aside and disregarding jury findings of negligence and proximate cause as to appellants' conduct after the collision with defendant.

The collision made the basis of this suit occurred about 7:30 o'clock on the morning of June 21, 1966, at the intersection of Northland Drive and Louise Lane. Northland Drive is a main traffic artery, running generally east and west, and has two lanes for eastbound traffic and two lanes for westbound traffic. Louise Lane is a residential street that joins Northland Drive from the north forming a "T" intersection.

The collision occurred when an automobile driven by Susan Quinius, the defendant, after stopping on Louise Lane before entering the intersection, proceeded into the intersection and struck the left rear door of the automobile plaintiff was driving easterly on Northland Drive.

When this collision took place, the automobile plaintiff was driving went out of control, veered to the right, then to the left, crossed over the center stripe on Northland Drive, and collided with another automobile being driven westerly on Northland Drive.

At the time of the accident the plaintiff, Mary Sue Polasek, and her husband, John Polasek, were going from their home west of Austin to the University of Texas, where John Polasek was enrolled as a student. Mrs. Polasek was driving an automobile owned by her father (Harry Manners, intervenor), and her husband was riding as a passenger in the front seat. John Polasek was reading a text book in preparation for a quiz in a history course at the University and was not aware of events related to the accident until the Polasek car collided with the second automobile.

Mrs. Polasek was severely injured about her head and face and was rendered unconscious. At the trial Mrs. Polasek had no memory of the collision itself. She last remembered driving in a residential area west of Austin, some distance from the place of the collision, and later recalled "waking up in the hospital."

Susan Quinius, the defendant, testified that she stopped at the intersection and waited for several cars to pass before entering Northland Drive from Louise Lane. She testified that she did not see the Polasek vehicle until after she pulled out into the intersection. When she saw the Polasek car, it was "right in front" of her, when she was already into her turn to proceed easterly on Northland Drive.

Judy Lester was riding with Susan Quinius in the front seat as a passenger, and was the only witness who described the relation of the two vehicles prior to the collision. Judy Lester testified that she warned Susan Quinius twice before

the collision with the Polasek car. Judy Lester gave the following testimony:

"A  Well, when she first started out into the intersection, I said, 'Susan,' and she said, 'I see the car.' Then when she continued on, I said, 'Susan, the car,' and by that time the Dart had collided with the car.

Q  And did it take about that time to do it?

A  Yes, sir.

Q  And which you would estimate was what, about a second?

A  Maybe one or two.

Q  One or two seconds?

A  Yes, sir.

\*  \*  \*  \*  \*  \*

Q  \* \* \* So had you been driving, you would not have pulled out?

A  No, sir.

Q  And regardless of what the distance was or what your estimate might be in there, the reason you wouldn't have, of course, was it was too close to pull out?

A  Yes, sir.

Q  In other words, it was apparent to you when you saw it that if the car pulled out there was going to be a collision?

A  Yes, sir.

\*  \*  \*  \*  \*  \*

Q  At the time Miss Quinius pulled out, the Polasek vehicle was so close that there was not a reasonable opportunity in your opinion of it clearing the intersection without danger of a collision?

A  That's correct."

In response to special issues the jury found that:

(1)  Defendant failed to keep a proper lookout;

(2)  This failure was a proximate cause of the collision;

(3)  Defendant turned left into Northland Drive at a time when she could not do so with safety;

(4)  That this was a proximate cause;

(5)  Defendant started from a stopped position when she could not do so with safety;

(6)  Which was a proximate cause;

(7)  Defendant failed to heed the warning given by her passenger;

(8)  That this was negligence;

(9)  And was a proximate cause of the collision.

The plaintiff requested special issues on discovered peril and also requested instructions on sudden emergency, both of which requests were refused by the trial court.

The jury found that:

(1)  Plaintiff failed to keep a proper lookout;

(2)  That this failure was a proximate cause;

(3)  Plaintiff failed to make proper application of her brakes;

(4)  That this was a proximate cause;

(5)  Plaintiff failed to turn her vehicle to the right;

(6)  That this was negligence, and

(7)  Was a proximate cause.

In addition, the jury found that:

(a)  Plaintiff sustained some injury as a result of the collision with defendant's vehicle;

(b)  That following the collision with defendant's vehicle plaintiff failed to make proper application of her brakes; and

(c)  This failure was a proximate cause.

The two findings last noted were disregarded by the trial court on the ground

that there was no evidence to support the findings. The jury found that plaintiff and intervenor were damaged in the total amount of $29,880.55.

In deciding this case, we must first examine the record to determine whether the findings of contributory negligence are supported by the evidence. The foremost question is whether the plaintiff, prior to the first collision, failed to keep a proper lookout, failed to make proper application of her brakes, and negligently failed to turn her vehicle to the right.

It is undisputed that as plaintiff's vehicle approached the scene of the collision the defendant was stopped at the corner of Louise Lane and Northland Drive. Judy Lester, the passenger riding with defendant, testified that defendant had stopped "right at the intersection line" and "waited for a few cars to go by."

The defendant testified she did not see plaintiff's car approaching from her right until the vehicle was in front of her and immediately before defendant struck it on the left rear door with the front of her car.

When asked whether she looked before entering Northland Drive, defendant testified:

"A Yes, sir. I looked both ways. There were cars coming. It was, you know, eight o'clock traffic.

Q In other words, you had to wait there a moment for traffic to clear the intersection?

A Yes, sir, I waited for quite a few cars to go back and forth.

Q So you waited there for several cars to clear and go by?

A Yes sir, I did."

Plaintiff because of her injuries, had no recollection of the collision. Her husband, who was reading a book, was unable to give any evidence bearing on events prior to the collision.

The only witness able to describe the relation of the two vehicles immediately before the impact was Judy Lester, defendant's passenger. Her testimony was given in part from a scale drawing introduced in evidence showing the intersection and related physical objects in the surrounding area. When Judy Lester first saw plaintiff's car, defendant was still stopped at the intersection line, and plaintiff's car was "about where the power pole is," a distance of some 220 feet west from the intersection of the center line of Louise Lane with the center line of Northland Drive, as shown by the scale drawing.

When the defendant "started out" into the intersection Judy Lester testified, the plaintiff's car had reached a point "about where the church entrance was," a distance of less than 90 feet west of the point of intersection of the center lines of the two streets. It was at this time that Judy Lester warned defendant twice before defendant struck plaintiff's vehicle. The period elapsing was "maybe one or two" seconds.

Judy Lester's testimony describing the warnings we have quoted above. The reaction of Judy Lester to the close proximity of plaintiff's car when defendant entered the intersection is found in her testimony as follows, part of which we quoted above:

"Q You were somewhat surprised when she pulled out?

A Yes, I was.

Q In other words, the car was close enough that you wouldn't have pulled out had you been driving?

A Yes, sir.

\* \* \* \* \* \*

Q In other words, it was apparent to you when you saw it that if the car pulled out there was going to be a collision?

A Yes, sir."

That a collision would result when defendant "pulled out" if she "continued going" was apparent to Judy Lester. The witness' testimony is quoted:

"Q * * * In any event, I believe that you have told us that when [Susan] pulled out you knew that there was going to be a collision with that blue car, didn't you?

* * * * * *

A Yes, sir.

Q In other words, that car was close enough so that you knew if you continued going, she was going to hit it?

A Yes, sir."

We find no direct evidence that plaintiff failed to keep a proper lookout. Judy Lester, witness for defendant, was firm in her testimony that she knew there was going to be a collision as soon as the defendent started up. The accident was inevitable if defendant continued going, as plaintiff's vehicle was already too close to avoid the collision when defendant started into the intersection. Plaintiff had but 90 feet to travel, which at 30 miles per hour would take about two seconds, to reach a point opposite the intersecting center lines of the two streets.

But for the testimony of an expert witness, the evidence does not support a finding that plaintiff failed to keep a proper lookout. Dr. William H. Tonn, Jr., a consulting engineer, qualified as an accident reconstruction witness. Tonn reached the conclusion that plaintiff was traveling 44 miles an hour and had four seconds prior to the collision in which to see defendant's car and to avoid the accident by some evasive action. Tonn assumed a rate of acceleration for defendants' car as it entered the intersection and assumed the collision occurred in 50 feet of the starting point. From these assumptions, Tonn concluded that four seconds elapsed from the time defendant started until she struck plaintiff's vehicle.

Tonn was asked to assume that plaintiff's vehicle was at "the power pole" when defendant started up and that the point of impact was near the center line of Northland Drive about on a prolongation of the east line of Louise Lane. Tonn found the distance between these two points to be 260 feet. Tonn was then permitted over objection to testify that plaintiff's vehicle traveled 260 feet in four seconds, the time he assumed it took defendant to reach the point of impact, which was a rate of 65 feet per second, or 44 miles per hour for plaintiff's vehicle.

The obvious fallacy of this conclusion is that there is no evidence that plaintiff's vehicle was in the vicinity of "the power pole" when defendant started into the intersection. The only direct testimony on the point was from Judy Lester who testified that "When Susan started out, [plaintiff's car] * * * was about where the church entrance was." The distance between the power pole and the church entrance is about 130 feet, or half the distance Tonn was asked to assume that plaintiff's car traveled between the time defendant started up and the time she struck plaintiff's car on its left rear door.

In arriving at four seconds for the time defendant consumed from the moment she started up until she struck plaintiff's car, Tonn measured a straight line from the center of Louise Lane to a point of impact indicated by some of the testimony, and assumed that defendant moved at a rate of six feet per second along the straight line. Defendant testified she was making a turn, suggesting an arc instead of a straight line. There was no testimony that defendant started from the center of Louise Lane or that she drove in a straight line to the point of impact.

The calculation Tonn made, to arrive at four seconds between start and impact, is not in harmony with the direct testimony of Judy Lester. She fixed the time between starting up and striking plaintiff's vehicle

as "a matter of a second or two," "one or two seconds," and "a split second."

On cross examination Tonn stated that in arriving at the figure of four seconds he had assumed a "rate of acceleration" for defendant's car. Tonn arrived at the assumed rate of acceleration by a formula employing the science and expertise described in this language:

"* * * what I used on that was the figure of six feet per second, and that would be an average. The way I arrived at that was if you dug out and left tire marks, that would be eleven or twelve feet per second and if you did the old gray-headed lady gradually going into the intersection, it would be around two to three feet per second; so I used the intermedium in there as the average."

The next step in Tonn's calculations was to "assume that [plaintiff's] * * * vehicle traveled from the power pole to the point of impact in the same four seconds." The fallacy of this assumption and the resulting conclusion we have already observed.

Using the assumptions and calculations thus described, Tonn gave testimony that if plaintiff had seen defendant start into Northland Drive she had ample time in which to take action to avoid the collision. Under examination Tonn agreed that, using his assumptions and calculations, if plaintiff's vehicle had locked its brakes at the church entrance when defendant pulled into Northland Drive, plaintiff's car would have required 148 feet to stop "and that's going to be 16 feet short of being sufficient distance to stop."

The trial court permitted Tonn to estimate the speed of defendant's car at the time of impact based solely on photographs purporting to show the damage to the vehicle. This testimony was not predicated upon technical and scientific information offered in evidence. Tonn was also allowed to testify the number of feet plaintiff needed to move away from defendant's vehicle in order to avoid the collision. Timely objection was made to the introduction of these conclusions.

Tonn in effect testified that his various conclusions were dependent upon the accuracy of each of the assumptions employed by him as to rate of acceleration of defendant's car, the speed of plaintiff's vehicle, and the distances traveled by each. If there was an error in any of the assumptions, the conclusions were inaccurate and unreliable.

With respect to this matter, Tonn testified as follows:

"Q And, of course, the opinions that you have given here were based upon the facts that you were asked to assume and this variable acceleration rate that you assumed?

A That is correct, sir.

Q So if either one or both of them are off, then your opinion is off?

A It would change the answer, that's correct.

* * * * * *

Q But you were asked to assume this point of impact, this point for something else, and this point for something else?

A That's right.

Q And based upon those distances and in the regular formula, the Polasek car had to be going 44 miles per hour to get here at the same time the Oldsmobile did (indicating)?

A That's correct. Using that average acceleration factor.

Q And if it would have been going 30 miles per hour, it wouldn't have gotten there and we wouldn't have had a collision?

A No, if it had been going 30 miles an hour, it would have taken longer to have gotten there.

Q And since there was a collision, we know that, the only thing we can as-

sume from that is that these distances were in error?

A  Either that or the acceleration rate or the acceleration rate of the Oldsmobile could have been a little lower than the average that I used.

Q  But the point I'm making is that either the variable of the acceleration rate or the assumed facts that you were asked to assume were obviously in error if the Polasek vehicle was going 30 miles an hour or 35 miles an hour and the collision occurred, isn't that correct?

A  Yes, sir."

Tonn's conclusion that plaintiff's vehicle was traveling at a rate of 44 miles an hour is at variance with the estimates made by two witnesses who saw the accident and by the police officers who investigated it. Milton Aleman, who was driving westerly on Northland Drive behind the second car that collided with plaintiff's vehicle, testified that plaintiff was driving "about thirty or thirty-five miles an hour," or she "could have been going twenty-five." The investigating officers estimated a speed of thirty miles an hour. Judy Lester, who saw plaintiff's car at "the power pole," before defendant started up, and apparently observed it until the actual impact, testified that it seemed to her plaintiff's car was going "about thirty or thirty-five. It wasn't going fast." On cross-examination she said the speed could have been twenty-five miles an hour.

The series of questions asked Tonn preliminary to his conclusion that plaintiff was traveling forty-four miles an hour if she was to meet defendant at the point of impact, were of a hypothetical nature. The witness appears to have been tendered as an "accident analyst" (as noted in 38 Tex. L.R. 503) to make an "analysis and reconstruction" of the collision. After Tonn at request of counsel measured the distance, on the chart in evidence, between "the power pole" and "the point of the collision," and

found this distance to be 260 feet, the following interrogation ensued:

"Q  Using the figure of four seconds, would you calculate at the time it took Susan Quinius to get to the point of impact, and assume that the Polasek vehicle traveled from the power pole to the point of impact in the same four seconds, and that, of course, necessarily follows, doesn't it?

A  That's right.

Q  They have got to be there at the same point?

A.  In order to contact each other, they do.

Q  Using that length of time and that distance, at what speed would your calculations show the Quinius car to be traveling?

A  That's 65 feet per second, which if you convert that into miles per hour would be 44 miles per hour."

■  Analysis and reconstruction of an accident by a qualified expert based upon a study of physical facts, photographs, diagrams, and depositions admitted into evidence will be accepted in evidence. Bolstad v. Egleson, 326 S.W.2d 506 (Tex.Civ. App., Houston, 1959, writ ref. n. r. e.). But this rule does not permit the formulation of evidence such as calculations based upon facts assumed and not in evidence. In order to reach the calculation of forty-four miles an hour as the speed of plaintiff's vehicle, Tonn assumed as requested by counsel that plaintiff was at "the power pole" when defendant started into the intersection and that she traveled to the point of impact in four seconds. Neither fact was in evidence

■  In asking hypothetical questions all the facts in evidence relevant to the formation of an opinion must be recited, and the party asking the question has the burden to supply any facts that are missing. Shuffield v. Taylor, 125 Tex. 601, 83 S.W.2d

955 (1935). The facts set out in the hypothetical question must have been admitted in evidence. Sabelli v. Security Insurance Company of New Haven, 372 S.W.2d 348 (Tex.Civ.App., Austin, 1963, writ ref. n. r. e.).

Tonn was called upon in the interrogation set out above to make certain calculations based in part on facts assumed but not in evidence. The effect upon a jury is reasonably expected to be the same whether the question be hypothetical, calling for an expert opinion, or one calling for the calculations of an accident analyst, if each such question is based on facts that have not been admitted in evidence. The evil of permitting an accident analyst to make calculations based on facts not in evidence and actually in conflict with direct testimony to the contrary becomes obvious under the facts of this case.

■ In seeking to have Tonn analyze and reconstruct the events immediately preceding the collision, defendant rests a presumption of fact upon facts presumed, which the Supreme Court has held cannot be done. Ft. Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S.W. 1130 (1914). The Supreme Court in Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791 (1955), declared that, "The fact relied upon to support the presumption must be proved." The rule is restated by the Court in the following quotation from authority there cited:

"No inference of fact should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were the facts in issue. One presumption cannot be based upon another presumption." 276 S.W.2d 791, 794, col. 1, citing authorities.

■ No fact or circumstance was proved in this case which justifies the presumption that plaintiff did not keep a proper lookout at all times, and more particularly during the brief moments between the time she was at the church entrance, when defendant pulled into the intersection, and the time defendant's car struck the left rear door of plaintiff's vehicle as it was about to emerge from the intersection. The testimony of Tonn giving his calculations is simply a presumption based upon other presumptions which not only were not proved, but which are contrary to undisputed direct testimony.

The direct evidence in this case shows that when defendant drove into the intersection, a collision was imminent. Although Judy Lester warned the defendant twice in the brief interval between entering the intersection and striking plaintiff's vehicle, the defendant did not see plaintiff's car. Defendant testified she thought the warnings were about a "white car further on down the road, but it was not in any danger when I got in the intersection."

■ Judy Lester testified that at the time defendant pulled into the intersection plaintiff's car was so close that there was no reasonable opportunity of it clearing the intersection without danger of a collision. This testimony is the only probative evidence establishing the relation of the two vehicles when defendant started into the intersection. Judy Lester was defendant's witness and defendant is bound by her evidence. Henderson v. Mason, 386 S.W. 2d 879 (Tex.Civ.App., El Paso, 1964, no writ); Plains Creamery v. Denny, 277 S.W.2d 755 (Tex.Civ.App., Amarillo, 1954, writ ref. n. r. e.). The fact that plaintiff read a portion of Judy Lester's deposition into evidence binds plaintiff only as to that part of the evidence. Parr v. Parr, 207 S.W.2d 187 (Tex.Civ.App., Amarillo, 1947, writ ref. n. r. e.); Clary v. Morgan Motor Co., 246 S.W.2d 936 (Tex.Civ.App., Fort Worth, 1952, no writ). The testimony read from the deposition established that the collision occurred "one or two seconds" after defendant started into the intersection.

Defendant argues on appeal that the testimony of Judy Lester "is extremely telling as far as appellant is concerned" to show that plaintiff was guilty of failure to keep a proper lookout.

A portion of this testimony, as set out in appellee's brief, reads as follows:

"Q In the interval of time, Judy, between the time you started out and the time that the collision occurred, did you see any motion of the car driven by Mrs. Polasek which would indicate to you that it was slowing down?

A No, sir.

Q Could you see the driver of that car?

A Yes, sir.

Q Did you see the driver do anything that would indicate that the driver had seen Susan's car?

A No, sir.

Q Did that car, excuse me. In which lane of traffic was that Polasek car? Either the curb lane or the center lane?

A The center lane.

Q Did it move out of the center lane at any time between the power pole when you first saw it and the time of the collision here at the intersection?

A No, sir, it did not.

Q Is there anything—on that day was there anything which would obstruct the view of Mrs. Polasek to have seen Susan's car as she came into the intersection while she was still back in this area (indicating) between the power pole and the church entrance?

A No, sir."

The theory of appellee's defense is further brought out in the additional testimony elicited from Judy Lester as quoted in the brief:

"Q By way of repetition, as you were watching it as it approached the unfortunate point of impact, did it slow down?

A No, sir, it did not.

* * * * * *

Q Judy, was there room for Mrs. Polasek to move to the right-hand or curb lane and thus avoid the collision with the car driven by Susan?

A Yes, sir, there was."

Appellee contends in effect that since the accident analyst, Tonn, testified that "it would take approximately four seconds for Susan Quinius to arrive at the point of impact from a stopped position at the intersection of Louise Lane and Northland Drive," this was the same interval of time plaintiff had in which to observe and avoid defendant's vehicle, since the two vehicles did collide in the intersection.

The conclusion of Tonn as to the time interval, based on a starting point, a direction, and a rate of acceleration not in evidence, is in conflict with the direct evidence of Judy Lester, who said the interval was a "matter of a second or two."

With the only direct evidence having established that a collision was imminent when defendant entered Northland Drive from Louise Lane, support for the jury's finding of improper lookout on the part of plaintiff can be found only in circumstantial evidence. This inference must be drawn from the circumstances of the collision.

■ The applicable rule was stated in Bledsoe v. Yarborough, 422 S.W.2d 222 (Tex.Civ.App., Tyler, 1967, no writ) in this language:

"To establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute a basis of legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing. At all events they must not be equally consistent with the non-existence of the ultimate fact." 422 S.W.2d 222, 227, citing authorities.

Plaintiff's vehicle was struck on the left rear door by the front of defendant's car, at a point near the eastern limits of the intersection. The significance of this direct evidence is that plaintiff's car was almost completely out of the intersection when struck by defendant. There is no presumption that an injured person is guilty of contributory negligence simply because an accident occurred. The rule is that it will be presumed the injured person was in the exercise of due care for his own safety when the accident happened. Missouri, K. & T. R. Co. of Texas v. Long, 293 S.W. 184 (Tex.Civ.App., Austin, reversed on other grounds, 299 S.W. 854, Tex.Comm. App., 1927).

> "It is also the rule that 'contributory negligence is not established by evidence which is equally consistent with the exercise of the care by plaintiff, or where the inference of due care is just as reasonable as is the inference of the absence thereof.'" Dewhurst v. South Texas Rendering Co., 232 S.W.2d 135 (Tex.Civ. App., San Antonio, 1950, writ ref., n. r. e.), citing authorities.

In the Dewhurst case on motion for rehearing Justice Norvell observed that "* * * the law will not denounce as negligent an act which may with equal reason be accounted for by a hypothesis based upon due care and caution." (232 S.W.2d 135, 139, col. 1) "Instead of saying, as does appellee," Justice Norvell declared, "that the evidence shows that Dewhurst drove in front of the truck *because he failed to keep a proper lookout and did not see the vehicle*, it is as reasonable to say that Dewhurst observed the truck, saw that it was slowing down almost to stop, and then proceeded across the intersection because he was entitled to the right of way." (Emphasis added).

In this case plaintiff's conduct can be accounted for on the hypothesis that (1) she saw defendant's car stopped in Louise Lane, (2) as she continued on Northland Drive she assumed defendant would remain stopped until plaintiff passed, (3) when defendant started into Northland Drive plaintiff realized she could not stop without hitting defendant or being hit, and (4) plaintiff promptly accelerated in an effort to get out of defendant's way, only to be struck by defendant just before plaintiff cleared the intersection.

The rule of the Dewhurst case and the authorities cited in Justice Norvell's opinion was applied in a recent case decided by the Tyler Court of Civil Appeals, involving an accident in an intersection. Mills v. Thomas, 435 S.W.2d 593 (Ref.N.R.E.). In that case the jury found the injured party failed to keep a proper lookout and the trial court entered judgment for damages in disregard of the jury's findings, which judgment the appellate court affirmed.

According to the calculations made by Tonn, the accident analyst, plaintiff was at "the power pole" when defendant entered the intersection traveling forty-four miles an hour and had four seconds in which to observe defendant's vehicle and take evasive action to avoid the collision. The direct evidence is the plaintiff was near the church entrance, 130 feet closer to the intersection than Tonn assumed, when defendant drove into the intersection, and it was clear that if defendant continued there would be a collision which did occur in a "matter of a second or two."

If Tonn's testimony be disregarded, there remains nothing substantial upon which a legitimate inference of negligence on the part of plaintiff can be based. To paraphrase the appropriate language of Justice Norvell in the Dewhurst case, we are unwilling to subscribe to the theory that the mere showing that a collision occurred at an open street intersection is sufficient in itself to raise the issue of negligent failure to maintain a proper lookout. (232 S.W.2d 135, 139).

The direct evidence showed that the impact was at a point that would place plaintiff's car nearly out of the intersection when hit. In Dixon v. Burling, 277 S.W.2d 957 (Tex.Civ.App., Galveston,

1955, no writ), in which the court reversed a judgment based on a finding of failure to keep a proper lookout, the facts were similar to the case at bar. In that case the defendant testified, as in our case, that she stopped at the intersection before entering, although the intersection was not controlled by traffic signs or signals, and that she never did see the other vehicle until a moment before the impact. In both cases the injured party's car was struck on the side near the rear by the front of defendant's car at a point where plaintiff's vehicle was practically out of the intersection. In Dixon v. Burling plaintiff testified that on approaching the intersection he looked right and left but saw no moving vehicle. In the present case such testimony from plaintiff is absent, although there is evidence that when plaintiff's car was about 90 feet from the center of the intersection defendant's vehicle was not moving but was stopped in Louise Lane.

In Dixon v. Burling the court said that the prudence of plaintiff's action "in proceeding across the intersection * * * [when he saw no moving vehicle] is clearly evidenced by the undisputed fact that he was 'practically out' of the intersection when the impact occurred, and by the further undisputed fact that the front portion of appellee's [defendant's] vehicle struck the right aftermost portion of appellant's [plaintiff's] vehicle." (277 S. W.2d 957, 959, col. 1).

■ Even if plaintiff saw defendant's car start up and enter the intersection, according to the testimony of Judy Lester, the only person who saw the location of plaintiff's car when that happened, plaintiff did not have time to take precautionary action that would have prevented the collision. Judy Lester testified that from the moment of starting into the intersection until the impact was a "matter of one or two seconds." The brief span of two seconds, or split seconds, does not give sufficient time to take evasive action. Green v. Pool, 421 S.W.2d 439 (Tex.Civ.

App., Tyler, 1967, no writ); Firestone Tire and Rubber Co. v. Rhodes, 256 S. W.2d 448 (Tex.Civ.App., Austin, 1953, Ref. n. r. e.).

Plaintiff did not have to take precautionary action until defendant entered the intersection. If plaintiff discovered defendant's action the moment it occurred, it must be shown there was time for her to take precautionary action before she can be found negligent, and in the absence of such time, it was not negligence for her not to apply her brakes or not turn her vehicle aside to avoid the collision. We conclude that plaintiff would not have had time to take precautionary action to prevent the collison after discovering that defendant had entered the intersection and therefore she was not guilty of negligence in failing to avoid the collision.

■ The jury found that plaintiff's failure to keep a proper lookout, failure to make proper application of her brakes, and failure to move her vehicle to the right were each a proximate cause of the collision with defendant's car. To establish proximate cause, both causation in fact and foreseeability must be shown to exist. The act or omission assigned as negligence must be one but for which the accident or injury would not have occurred. Ussery v. Ewell Hodges, Inc., 417 S.W.2d 332 (Tex.Civ.App., Tyler, 1967, writ ref., n. r. e.), and authorities cited. The causal connection must be proved beyond the point of conjecture, for mere speculation or surmise is not sufficient. Ussery v. Ewell Hodges, Inc., supra, and authorities cited 417 S.W.2d 335.

The Supreme Court pointed out in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, (1898), that even though there is slight testimony, if its probative force is so weak that it raises only a surmise or mere suspicion that the fact sought to be established exists, a trial court has the duty to instruct a verdict because such testimony falls short in law of being "any evidence." (44 S.W. 1059, 1063).

If the record shows that the collision would have occurred regardless of the negligent acts or omissions attributed to plaintiff and that these acts or omissions did not contribute to cause the collision, the findings of proximate cause cannot stand. Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S. W.2d 359 (1957). The evidence bearing on this question is summarized here for clarity.

The direct evidence shows that (1) defendant was not aware of plaintiff's car when she pulled out into Northland Drive; (2) when defendant first saw plaintiff's car, it was right in front of her; (3) the warnings Judy Lester, the passenger, gave defendant were met with the reply that she saw the car, but the car she saw was a "white car" so far down the street it was out of danger; (4) when defendant drove into the intersection, plaintiff's vehicle "was about where the church entrance was," approximately 90 feet from the center of the intersection; (5) it was apparent to Judy Lester when she saw plaintiff's car that if defendant "pulled out there was going to be a collision;" (6) the two cars were so close when defendant pulled out that there was no reasonable opportunity for plaintiff to clear the intersection without danger of a collision, and (7) the time between defendant's entering the intersection and the impact was "a matter of one or two seconds."

Tonn in his reconstruction of the accident confirmed that plaintiff could not have stopped in time to avoid the collision if she had applied her brakes. Tonn testified that if plaintiff's vehicle was at the west corner of the church entrance (where Judy Lester estimated it to be) when defendant drove into the intersection, plaintiff would have required 148 feet to stop with locked brakes. Tonn testified this would have placed plaintiff's car 16 feet past a point of impact used by him, which was outside the intersection and beyond the impact point described by the police

officers who investigated the accident. With brakes locked, plaintiff's vehicle would have gone more than 40 feet past the point of impact which the officers named.

We hold that there is in the record no evidence from which the jury could reasonably have inferred that but for the failure of plaintiff to keep a proper lookout, apply her brakes, or turn to the right the collision would not have occurred. Any slight evidence or scintilla of evidence, if any can be assumed from the circumstances of how the collision occurred, is of no legal consequence. 38 Tex. L.Rev. 361 (1960), Calvert, "No Evidence and Insufficient Evidence Points of Error," and authorities there cited.

By cross points appellee urges error of the trial court stated as follows:

No. 1—"The trial court erred in sustaining appellant's motion in limine with respect to the causation of injury by reason of the failure of the appellant to wear her seat belt."

No. 2—"The trial court erred in sustaining appellant's motion in limine with respect to appellee's pleading of an increase in injury by reason of appellant's failure to wear her seat belt."

Appellee pleaded that appellant failed to wear her seat belt. Because of this failure, appellee contends (1) appellant lost control of her car when struck by defendant, "thus creating a condition making the second collision possible," and (2) the injuries sustained by appellant came as a result of the second collision, which she would not have sustained, or the injuries would have been less severe, if appellant had been wearing her seat belt.

The evidence shows that plaintiff's car was equipped with lap-type seat belts. Appellee's theory is that (1) appellant was thrown out of position when the first collision occurred because she was not held down by a seat belt and lost control of her car as a result, and (2) when the second

collision occurred appellant was thrown head-first into the right-hand side of the wind shield resulting in severe disfiguring injuries she would not have sustained if she had been restrained by her seat belt.

Four witnesses testified regarding the course of plaintiff's vehicle immediately following the first collision. Susan Quinius testified that after it was hit plaintiff's car swerved to the right, went near the south curb of Northland Drive, then turned left, crossed the center line, and collided with the vehicle driven by Manuel Estrada. Judy Lester stated that when hit the back end of plaintiff's car went to the right as if "it was kinda sliding sideways rather than going straight forward," then crossed over the center line into the westbound lane where it hit the other vehicle. Milton Aleman, who was driving westerly on Northland Drive about 100 feet behind the Estrada car, testified that plaintiff's car "was hit on the back fender and started to go to the opposite lane," "then she got back on her lane," "then she started across the left-hand lane again," and ran into the Estrada vehicle. Estrada, driver of the third car involved in the accident, testified that plaintiff's car, after being hit at the intersection, "came towards me, and I saw it wiggle like that (indicating), and then again, and then it started darting right ahead of me." The evidence of these four witnesses is not contradicted in the simple description of an automobile out of control.

We find no evidence in the record to establish whether plaintiff was or was not wearing her seat belt at the time of the collision. Milton Aleman appears to have been the first person to try to assist plaintiff after the collision with the Estrada car. Aleman first went to the Estrada vehicle. He then went to plaintiff's car "five or six minutes" after the collision. He found plaintiff *sitting under the steering wheel* laying towards the hump in the middle." (Emphasis added) He did not recall whether she had her seat belt on. Aleman did "lift her back up" and at that

time "saw a man on the right-hand side getting out." Aleman went around the car, saw the man start to fall, caught him," and took him along side the curb and * * * stayed with him."

The police arrived "about half an hour or fifteen minutes" later, but meanwhile Aleman did not go back to see after plaintiff. Two police officers testified that when each arrived at the accident and first saw plaintiff she did not have her seat belt on. One of the officers stated that when he arrived other people, one of whom he believed to be a doctor, were at the scene. He found plaintiff "laying with her head on the seat where the passenger generally sits" her head being "within a foot or a foot and a half" of the right-hand door. The officer said when he arrived the seat belts were on the back of the front seat. No witness, who might have administered aid to plaintiff, between the time Aleman first saw her and the time the officers arrived, testified at the trial with regard to the seat belts.

In the bill made by appellee in support of the cross points of error we are unable to find any testimony that plaintiff's injuries were increased by reason of failure to wear her seat belt. Appellee sought to show that plaintiff was injured by being thrown into the wind shield on the right-hand side, in front of the position occupied by her husband as the passenger. We do not find this contention supported in the evidence.

The wind shield on the passenger's side was broken through, completely penetrated. The attending physician for both plaintiff and her husband, Dr. Francis A. Morris, Jr., testified that the injuries sustained by plaintiff's husband were "more precisely cut" and with "no loss of tissue," which to the doctor would indicate glass cuts. The doctor's record did not show that he found any glass in the lacerations suffered by plaintiff. It was his opinion that while the exact injuries suffered may have been altered by the use of seat belts, different

injuries of a more severe nature could result when the seat belt was fastened. Dr. Morris took the position that he as a doctor could not tell what would or would not have happened if plaintiff and her husband had worn seat belts.

■ The evidence appellee offered to show that plaintiff was not wearing her seat belt, causing her to lose control of her car, and that this failure resulted in greater injury to her was insufficient to raise fact issues on these questions. Appellee contends that plaintiff had both a statutory and common law duty to wear a seat belt and that the doctrine of avoidable consequence is applicable in this case. In view of our holding that the evidence did not raise the fact issues, we do not reach the question of duty to wear a seat belt or the applicability here of the doctrine of avoidable consequences.

Appellee's first and second cross points of error are overruled.

Appellee contends under her third cross point of error that the trial court incorrectly set aside and disregarded the jury's answers to special issues 20 and 21. The jury found in answer to these issues that in the approximately two and a half seconds elapsing between the first and the second collision plaintiff failed to make proper application of her brakes and such failure was a proximate cause of the second collision. We hold that the trial court properly set aside and disregarded such findings.

The evidence which we have already reviewed establishes that after the initial impact, plaintiff's vehicle was instantly propelled in an erratic manner into the path of the oncoming Estrada vehicle. If plaintiff was out of position and was unable to control her car during the less than three seconds it took to strike the second vehicle, it was because defendant, as the jury found, negligently drove into the side of plaintiff's car, just as it was emerging from the intersection, and sent it on its undirected course.

The evidence establishes that plaintiff's car was knocked out of control by the first collision and that it remained out of control until the second collision occurred less than three seconds later. It would be a strange doctrine to hold that the driver of a vehicle is guilty of contributory negligence in failing to regain such control of her vehicle, after being struck through the negligence of defendant, as would enable her to avoid a second collision within the very few seconds plaintiff had at her disposal between the two collisions.

In at least two cases it has been held that if in a "matter of seconds" or in "about two seconds of time" a driver fails to regain control of a vehicle that has been knocked out of control, such failure to regain effective control will not constitute negligence. In Renner v. National Biscuit Co., 173 S.W.2d 332 (Tex.Civ.App., Galveston, 1943, writ ref. w. o. m.), the court approved language declaring it a matter of common knowledge that under such circumstances effective control could not be regained within a matter of seconds. In Firestone Tire and Rubber Co. v. Rhodes, supra, (256 S.W.2d 452, col. 1), a driver was held not to have the opportunity in the brief period of two seconds to regain control, stop, or change his course to avoid the second collision.

■ The trial court correctly set aside and disregarded the findings of the jury attributing negligence to plaintiff for failure to apply her brakes between the first collision and the second, a matter of two and a fraction seconds. Appellee's third cross point of error is overruled.

Counsel for appellant and for appellee in their briefs have debated the question of whether the jury found in effect that plaintiff sustained some injury solely as a result of the first collision. The issue submitted asked the jury whether "plaintiff sustained no injury solely as a result of the collision with defendant's automobile." The jury was instructed to answer "She did not" or "She did." The jury said, "She did not."

Reading the answer into the question, it is clear the jury answered that plaintiff *did not* sustain *no injury* solely as a result of the collision with defendant's automobile. Although the grammar of such an answer stated in that manner leaves something lacking for the purist, we find that its meaning is simply that plaintiff suffered some injury as a result of the first collision.

In response to special issues 2, 4, 6, 9, and 11, the jury found that each of the various acts of negligence on the part of defendant was "a proximate cause of the collisions made the basis of this suit." It is settled that when the evidence shows that defendant's negligence in entering the intersection was the efficient cause which in its natural and continuous sequence, unbroken by any efficient intervening cause, also produced the second collision, defendant will be held liable for all damages caused by both collisions. Holt v. Ray, 435 S.W.2d 568 (Tex.Civ.App., Eastland, 1968, no writ), and authorities cited, 435 S.W.2d 571–572.

In answer to special issues, the jury found that plaintiff Mary Sue Polasek had suffered damages in the aggregate amount of $28,080.55 and that damages to Harry Manners for property loss in his automobile amounted to $1,800.

Under the disposition we make of this cause, by which we reverse the judgment of the trial court and render judgment for appellants, we have not reached appellants' points of error 13, 14, and 15 directed to refusal of the trial court to give requested instructions on standard of care required in a sudden emergency and, alternatively, the court's refusal of requested issues on the doctrine of imminent peril.

The judgment of the trial court decreeing that plaintiffs take nothing by their suit is reversed. We render judgment for Mary Sue Polasek in the full amounts found by the jury to be her damages by reason of medical services and personal injuries sustained, and we render judgment for Harry Manners for the amount found by the jury to be damages to his 1965 Dodge automobile.

Judgment of the trial court is reversed and rendered.