Gloria HENMAN, Appellant
(Defendant below),

v.

Robert KLINGER, Appellee (Plaintiff below).

No. 3430.

Supreme Court of Wyoming.

Jan. 7, 1966.

R. R. Bostwick, of Murane, Bostwick, McDaniel & Scott, Casper, for appellant.

G. L. Spence, Riverton, for appellee.

Before PARKER, C. J., and HARNS-BERGER, GRAY and McINTYRE, JJ.

Mr. Justice GRAY delivered the opinion of the court.

Plaintiff, Robert Klinger, commenced an action against the defendant, Gloria Henman, to recover damages resulting from an automobile accident. Upon trial of the case before a jury the plaintiff obtained a verdict and judgment in the sum of $29,833.95. After denial of a motion for new trial based upon the claim that the damages were excessive and that certain errors of law occurred during the trial, the defendant has appealed.

The errors claimed are such that no extensive recital of the facts pertaining to the accident is required. Briefly, the record discloses that at about 10 p. m. on November 28, 1962, the defendant was driving an automobile in a southwesterly direction toward Lander, Wyoming, on the highway running between Hudson, Wyoming, and Lander. Defendant was alone in the car and testified she did not know how fast she was driving. Shortly before reaching a driveway to the "Hanson Place" on the northwest side of the highway the de-

fendant passed a car also being driven toward Lander by Mrs. Catherine Kitchen. Also approaching the area of the "Hanson" driveway from the opposite direction was the car being driven by plaintiff, toward Hudson. According to the testimony of Mrs. Kitchen, the defendant, almost immediately after passing the Kitchen car and without signaling in any fashion and without stopping, pulled off the highway onto the edge of the "Hanson" driveway, reversed her direction by making a U-turn across the highway, and drove back toward Hudson. When asked to locate approximately the position of the Kitchen car and plaintiff's car at the time of the U-turn, the defendant replied that she could not do so but she "automatically judged" that she had "plenty of room" to make the turn. With respect to this U-turn, Mrs. Kitchen testified she slowed down to about 40 miles per hour when defendant's car passed her because of defendant's erratic driving, and then when she observed the defendant starting to make the turn in front of her she applied her brakes because defendant's car "was close enough that I thought I would hit her." Plaintiff's testimony as to his involvement with the defendant's car was in substance that he had observed the lights of the defendant's car and the Kitchen car coming toward him; that suddenly he saw a cloud of dust on the highway ahead; he then saw the defendant's car "broadside in front" of him; he applied his brakes; he heard his tires "screaming"; and the last thing he remembered was that he "was right on top of this car." There was other evidence tending to show that when plaintiff's car went into what was described as a "panic skid" it skidded, out of control, some 225 feet; crossed the center line of the highway into the opposite lane of travel occupied by the Kitchen car; and collided almost "head-on" with the Kitchen car, causing severe damage to both cars and severe injuries to the occupants. Neither the plaintiff's car nor the Kitchen car struck the car being driven by the defendant.

The important question in this case is defendant's claim that the trial court erred in permitting counsel for the plaintiff, in his argument to the jury, over timely objection, to state and "blackboard" an award for pain and suffering on a unit-of-time basis.

The following is the tenor of the argument:

"The fact is, this man was hurt and hurt horribly and he was in excruciating pain and most of the time it was indescribable pain, and he was in the hospital for seventy days, and I wouldn't ask you to say, but, well, what would you take in money for seventy days in the hospital in this kind of pain? You take your seventy days in the hospital, I don't know what you would take for it, but I am going to say in this case the evidence is of such a nature that you could award $200.00 a day for that seventy days, * * *"

Thus, for this period of time counsel comes up with a figure of $14,000. Over a period of 45 years—the life expectancy of plaintiff—the value per unit-of-time is reduced. Nevertheless, counsel for plaintiff eventually computed and "blackboarded" for the jury a total figure of $66,630 for this element of general damages.

One obvious impropriety in the argument is the question put to members of the jury, "What would you take in money for seventy days in the hospital in this kind of pain?" In the law such technique has become known as resort to the "Golden Rule," a practice we cautioned against in Logan v. Pacific Intermountain Express Company, Wyo., 400 P.2d 488, 494. The point, however, has not been urged by defendant and without further comment we pass to the "unit-of-time" phase of the argument. The propriety of this technique has not heretofore been passed upon by this court. Actually we could avoid doing so here. The contention of defendant seems to overlook the fundamental rule that a judgment will not be reversed for an error in the proceedings "which does not affect the sub-

stantial rights of the adverse party." Rule 72(g), Wyoming Rules of Civil Procedure. We are convinced that such rule is applicable and more will be said of this later. Nevertheless, to avoid answering the question propounded on that narrow ground would, in our opinion, result in a disservice to the trial bench and the bar of this state. The increased utilization of the technique in recent years has become a matter of concern, locally and nationally. If as its dedicated advocates contend it is an aid to the jury in determining reasonable compensation for an injury for which the law furnishes no standard, then we ought to remove uncertainty and approve of it. Conversely, if as its equally dedicated detractors contend it is simply a device primarily designed to mislead the jury, then we ought to condemn it. For such reasons we feel duty bound to consider fully the question propounded and not to leave it for future consideration on a case-to-case basis.

Admittedly it is a close and difficult question. A review of the authorities discloses much disparity in view. So far as we can determine no discernible "clear-cut" majority or minority rule has, as yet, emerged from the wealth of court decisions that have passed upon the matter. As a general proposition three distinct approaches to the problem have been taken.

The following jurisdictions have adopted what has become known as the "Botta Rule," Botta v. Brunner, 26 N.J. 82, 138 A. 2d 713, 60 A.L.R.2d 1331, or its equivalent, which condemns the technique: Delaware, Hawaii, Illinois, Kansas, Missouri, New Hampshire, New Jersey, New York, North Dakota, Ohio, Pennsylvania, South Carolina, Virginia, West Virginia, and Wisconsin.[1]

The following jurisdictions reject the "Botta Rule" and follow such cases as Arnold v. Ellis, 231 Miss. 757, 97 So.2d 744,

which approve of the technique: Alabama, Arkansas, Colorado, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, and Texas.[2]

The following jurisdictions pursue a middle ground and entrust the matter to the discretion of the trial judge: Florida, Montana, Nevada, Utah, and Washington.[3]

A summation of the various reasons advanced by the courts for accepting or rejecting the "Botta Rule" will be found in Ratner v. Arrington, Fla.App., 111 So.2d 82, 88, 89. We will not undertake to repeat all of the reasons assigned but we are convinced that the rationale of those authorities adhering to the "Botta Rule" or its equivalent is better suited to safeguard the fundamentals of a fair trial of the factual issue of reasonable compensation for pain and suffering and does not serve unduly to restrain the prerogatives of counsel to argue all legitimate inferences that might be drawn from the evidence properly before the jury.

To us, such a conclusion seems rather inherent from the manner in which the issue is presented to the jury. A jury is usually instructed, as it was here, in the following manner:

"You are instructed that if you find from the evidence and the Court's instructions that plaintiff is entitled to recover for PAIN AND SUFFERING as an element of damage you are reminded that you cannot measure in dollars and cents the exact amount of such damage, if any, but it is for you to say, in the exercise of a sound discretion, after considering and weighing all the facts in the case, without fear and without favor and without passion and prejudice, what amount of money will reasonably compensate plaintiff for this element of damage. In your consideration of this element of damage, if oth-

1. See Franco v. Fujimoto, 47 Hawaii 408, 390 P.2d 740, 745, 746. See also Paley v. Brust, 21 App.Div.2d 758, 250 N.Y.S.2d 356, 358; Ruby v. Casello, 204 Pa.Super. 9, 201 A.2d 219.

2. See Franco v. Fujimoto, supra. See also Vanlandingham v. Gartman, 236 Ark. 504, 367 S.W.2d 111.

3. See Franco v. Fujimoto, supra.

erwise proven, it is not necessary that any witness should have expressed an opinion as to the amount of such damage, but you may make such estimate from the facts and circumstances proven during the trial of this case, and by considering them in connection with your knowledge, observation and experience in life."

The instruction correctly enunciates the legal principles involved. No witness can testify as to a per diem value for pain and suffering. There is no fixed standard or formula for measurement of the exact amount that might be fixed as reasonable compensation. Pain and suffering are not dealt with as a commodity in the marketplace. The law entrusts the matter, as it does many other things, to the common sense and good judgment of the jury. Obviously it is not an easy task. To say, however, that adherence to the law, unaided by enlightenment of a unit-of-time argument, will result in a "blind guess" by the jury is scarcely a persuasive answer to the problem. Caley v. Manicke, 24 Ill.2d 390, 182 N.E.2d 206, 208. How can the jury function be aided by an argument which necessarily is premised on assumptions of fact having no evidentiary basis and tempered only by the candor of counsel advancing such an argument? Without intimating that a jury will resort to a "blind guess" rather than to apply to the evidence the combined "knowledge, observation and experience" of its members as instructed, what is there that makes the "blind guess" of counsel any more alluring or helpful to the true administration of justice? Nothing that we can discover. Viewed realistically, we are disposed to regard the technique as nothing more than a device to clothe with an aura of reasonableness the often fantastic claims made for such an element of damage and hence a technique tending primarily to mislead the jury. And neither do we believe that the misleading effect of such argument can be cured by the use of a similar argument by opposing counsel. As Judge Roger J. Traynor said in his dissent to Seffert v. Los Angeles Transit Lines, 56 Cal.2d 498, 15 Cal.Rptr. 161, 171, 364 P.2d 337, 347, "Truth is not served by a clash of sophistic arguments." See also Caley v. Manicke, supra, 182 N.E. 2d at 209.

■ We hold that the trial court erred in overruling the defendant's objection to use of the technique by plaintiff's counsel. In fact the trial court upon reconsideration —after argument and presentation of authorities by counsel for both parties on the motion for new trial—reached the same conclusion. Nevertheless, the trial court refused to grant a new trial for the reason that such error was not shown to have been prejudicial in that the damages awarded did not appear to have been excessive in view of the injuries suffered by plaintiff. We agree.

Unfortunately the jury returned a lump-sum verdict, in the amount of $29,833.95. Thus, we are not informed as to the awards made for the several elements of damages claimed. Nevertheless, because of the odd amount of the award it seems rather apparent that the jury allowed the stipulated amount of damage to plaintiff's car in the sum of $2,137; the stipulated amount of the hospital bill in the sum of $1,164.95; doctor bills in the sum of $532; or a total of $3,-833.95 for those items.

The balance of the award in the sum of $26,000 can thus reasonably be allocated to loss of earning capacity, permanent injury, and pain and suffering. With respect to loss of earnings there was evidence from which the jury could find that plaintiff suffered a loss of earnings from the time of his injury to the time of trial in the approximate sum of $10,000, which could not have been avoided by reasonable effort. Thayer v. Smith, Wyo., 380 P.2d 852, 854. There is no way to measure the dollar amount which the jury might have allowed for future diminution of earning capacity, but there was a basis in the evidence for such an allowance. The plaintiff, at the time of injury, was a "mill" worker earning approximately $6,000 per year. He had only a

high school education and no other training. Subsequent to the injury he could not pass the physical examination required for such work and there was medical testimony that he would be unable to drive a truck or perform any sort of work which required "much use of his back and legs." While it is true that plaintiff, other than a permanent partial disability of 10 percent, had made a good initial recovery according to medical standards and could do "other work," the fact remains that at the time of trial plaintiff had not obtained other regular employment and the jury might well have believed that additional time would be required before plaintiff, who was a young man 24 years of age, could through training obtain suitable employment restoring him to his approximate previous earning capacity.

We may assume also that the jury did award some amount for pain and suffering. It would have been improper for the jury to have done otherwise. DeWitty v. Decker, Wyo., 383 P.2d 734, 736. Just how much of the $26,000 amount above mentioned was apportioned for such damages we are unable to say. Nevertheless, there was substantial evidence that plaintiff was severely injured and suffered excruciating pain at the time of injury and for several weeks thereafter. When plaintiff was taken to the hospital immediately following the accident he was, according to Dr. Harry Tipton, the attending physician, "in a very serious condition." Plaintiff was in shock. He suffered from temporary paralysis of the intestines; temporary paralysis of the urinary tract; a fracture of the "mid-back"; a fracture of the pelvis; and a fracture of the right shoulder. For a period of six weeks plaintiff was kept in bed with his back bent "backwards." During plaintiff's 70-day stay in the hospital sedatives and narcotics were regularly administered to him for relief of pain. There was also evidence of suffering subsequent to the hospitalization. Dr. Tipton also testified that future surgery was indicated for repair of a nerve injury and repair of the back by way of a "spinal fusion," which would re-quire hospitalization and inactivity for a period of from six weeks to four months. As we view it, a substantial award, in any event, was warranted under the evidence.

■ Thus, against such a background we cannot say that the award made for permanent partial disability, loss of earning capacity, and for pain and suffering, as a direct result of the technique utilized by plaintiff's counsel, was shown to have been excessive or that the award was "so excessive or unreasonable as to indicate passion or prejudice on the part of the jury." Pan American Petroleum Corporation v. Like, Wyo., 381 P.2d 70, 76. Particularly is that true where, as here, the trial court, on a motion for new trial based upon that ground, refused to set aside the verdict.

A further claim of error by defendant relates to the defense of contributory negligence. At least we so confine it for the reason that although counsel touches upon the lack of sufficient evidence to support the determination by the jury that defendant was guilty of negligence, the point is not seriously argued and properly so. Such an argument would be wholly without merit. In essence the argument is that through application of "Newton's Laws of Physics" to the physical facts and testimony in the case, plaintiff is shown to have been contributorily negligent as a matter of law. Reminding that we will not so declare "except in the clearest case," Ford Motor Company v. Arguello, Wyo., 382 P.2d 886, 892, we are unable to agree with defendant's contention.

■ We have not been furnished with the details of counsel's computation, which is described as a problem in "kinetic energy." However, we are advised in a general way that the computation is premised on the "unspent force" of plaintiff's car at the time of impact with the Kitchen car, which when related to the skid marks of 225 feet left by plaintiff's car and to the speed and skid marks of the Kitchen car, scientifically demonstrates that plaintiff was traveling at a speed of 75.5 miles per hour as opposed to plaintiff's testimony that he was travel-

636

ing at a speed between 55 and 60 miles per hour. Aside from any question of such speed constituting a proximate cause of the accident, the computation leaves us unimpressed. It is founded upon several imponderables. For example, it assumes that the "unspent force" of plaintiff's car, when coming in contact with the Kitchen car traveling at 40 miles per hour, was sufficient to stop the Kitchen car "dead in its tracks" and move it sideways a distance of two feet. Such an assumption overlooks the fact that Mrs. Kitchen's testimony as to such speed was only an estimate and it ignores entirely, as we understand the record, 29 feet of skid marks left by the Kitchen car after her speed had been reduced and just before the impact. The computation also leaves out of consideration the effect, if any, of the momentum of the Kitchen car to its "sideway" movement—plaintiff's car having struck the Kitchen car in the front at a 45-degree angle. Furthermore, there is indication in the record that the accuracy of the computation is not free from doubt. A physicist, called as a witness by plaintiff, conducted experiments at the scene of the accident with a car said to have been comparable to plaintiff's car for the purpose of arriving at a coefficient of friction which could be used to determine the "skid distance" before stopping of such car traveling at a speed of 65 miles per hour. According to the physicist's computation the "skid distance" was 250 feet, which when related to plaintiff's skid marks of 225 feet would indicate that the "unspent force" of plaintiff's car at the time of impact was the force represented by a "skid distance" of 25 feet. The significance of such force was not made clear. The point is, however, that the defendant utilized the identical "coefficient of friction" in her computation. Now, obviously, if plaintiff's car was traveling at a speed of 75.5 miles per hour, as the defendant contends, the "unspent force" would substantially exceed a "skid distance" of 25 feet. The cause of the apparent discrepancy is not explained to our satisfaction. Thus, even though it may be possible under some circumstances scientifically to determine the matter of speed as defendant argues—a matter we do not decide—we are convinced that such is not the case here. We agree with the trial court that the question of plaintiff's speed presented an issue of fact for the jury.

It is further claimed that the trial court erred in refusing to submit to the jury an instruction to the effect that it is the duty of a driver using the highways in the nighttime to have his car under such control that he can stop it within the distance illuminated by his headlights without colliding with an object on the highway. The contention is without merit. We declined to adopt such a rigid rule in Gamet v. Beazley, 62 Wyo. 1, 159 P.2d 916, 920, and no persuasive argument is presented here which would prompt us to reconsider such holding.

Finding no prejudicial error in the proceedings, we affirm the judgment.

Affirmed.