**JOHN B. RODEN, JR., INC., a Wyoming Corporation, Appellant (Defendant below),**
**George Bohannon Transportation, Inc., a Wyoming Corporation (Defendant below),**

v.

**Harvey DAVIS and Dean Davis, also known as Harvey Dean Davis, and Harvey Dean Davis as Administrator of the Estate of Marjorie Faye Davis, Deceased, Appellees (Plaintiffs below).**

No. 3752.

Supreme Court of Wyoming.

Nov. 3, 1969.

Rehearing Denied Dec. 3, 1969.

Wm. H. Brown, of Brown, Drew, Apostolos, Barton & Massey, Casper, for appellant.

Cecil K. Hughes, of Reynolds & Hughes, Sundance, G. L. Spence, Riverton, for appellees.

Before GRAY, C. J., and McINTYRE, PARKER and McEWAN, JJ.

GRAY, Chief Justice, delivered the opinion of the court.

By this action Harvey Dean Davis, as administrator of the estate of his deceased

wife, sought to recover damages against defendants for wrongful death; and as owner, together with his father, Harvey Davis, to recover damages to a dump truck caused by the collision of the truck with a cable stretched across a highway by defendants in their efforts to "right" an overturned tank truck. The negligence charged by plaintiff was that defendants wrongfully, negligently, and carelessly obstructed the highway by the cable without any warning to indicate danger or without giving notice thereof to users of the highway. The defendants generally denied such charge and affirmatively alleged that decedent was guilty of contributory negligence and that such negligence was the sole proximate cause of the accident. The ultimate issues so framed with respect to liability were tried by the court without a jury and thereafter the trial judge entered findings of fact and conclusions of law determining that the corporate defendants and defendant John B. Roden, Jr.,[1] were negligent and jointly and severally liable to plaintiffs, and that decedent was not contributorily negligent. The issue of damages was then tried to a jury and damages fixed in the sum of $71,183.50 for the death of Mrs. Davis and in the sum of $2,060.95 for damages to the dump truck. Judgment was entered accordingly and upon denial of motions for new trial both corporate defendants appealed. The appeal of defendant George Bohannon Transportation, Inc., was not perfected; thus the only matter before us is the appeal of defendant John B. Roden, Jr., Inc., and that is limited to the trial judge's determination of liability and the denial of a motion for new trial.

The record discloses with little contradiction that the accident occurred soon after 8:00 a. m. on what was known as the "Nine-Mile County Road," which ran northerly a distance of some nine miles from the Kaycee-Sussex road in Johnson County, Wyoming. At the time the sun was not shining and the day was variously described as "cloudy," "misty," "overcast," "hazy," and "dull." The ground was damp from previous rainfall. For years the road had been a graded dirt road some 23 feet in width and elevated about 2 feet above the surface at the place where the accident occurred. The travel on the road was not heavy and consisted principally of vehicles going to and from a newly discovered oil field and by a few ranchers in the vicinity. For some 10 or 12 days prior to the accident the road was being graveled and at the scene of the accident, according to measurements taken by the highway patrolman, a "windrow" of gravel occupied 10 feet of the road on the east side, which left 13 feet on the west side for movement of traffic, although some allowance had to be made for the soft shoulder. On the evening before the accident Cecil Rasberry was driving a tanker truck owned by the Roden corporation in a northerly direction on the lefthand or west side of the road, and about the time he reached the point of the accident the front wheel caught the soft shoulder and the truck "flopped over" on its left side into the borrow pit. Early the next morning Glenn Williams arrived there with what was called a "rig-up" truck belonging to the Bohannon corporation and which was equipped with a "winch" and cable one inch in diameter on the rear. The winch and cable were to be used in righting the Roden truck and for that purpose Williams pulled his truck off the road on the east side, backed it up perpendicularly to that side of the road and the Roden truck on the west side, pulled the cable across the road to the Roden truck, and got back into his truck to wait for Roden and Rasberry. Soon thereafter Mr. Mosebrucker, driver of the first gravel-loaded dump truck through the scene of the accident, topped a hill approximately one-half mile south thereof, observed the overturned tanker truck and the "rig-up" truck when about

---

1. For a reason undisclosed by the record except as stated in the judgment, the claim against defendant John B. Roden, Jr., as an individual, was dismissed prior to the judgment.

half way down the hill, started slowing up when he was within one-quarter mile of the trucks, and seeing the cable across the road and the Roden truck in the ditch "stopped on the south side about fifty feet away from the wreck" and got out to see if anyone was hurt. After some delay he went on through, dumped his load, and testified that on the way back to the gravel pit he stopped Mr. Peterson, driver of the next dump truck, and warned him of the presence of the Roden truck and the "winch truck" over the hill and to "Be careful that cable is laying across, and he might have it stuck." As Peterson came over the hill and approached the scene of the accident he saw two men on top of the Roden truck with the cable across the road and up over the Roden truck. He slowed down but did not stop and went on through on signal from Roden. On cross he said he was probably 20 to 25 yards away when he saw the cable but then conceded that in a deposition he had previously said he first saw it "from four to six hundred feet away." The circumstances were the same when Mr. Watts, the next dump-truck driver, approached. He slowed down, came to a stop when he saw the cable about 50 feet away, then went through. All three of the dump-truck drivers mentioned said they had no difficulty in driving their loaded trucks through the area in which the accident occurred. Another witness, Mr. Skiles, a county commissioner who came upon the scene from the south after the accident, said he did not see the cable until he had stopped and was about 50 or 100 feet away. When asked on cross if he could have seen the cable before he got there he said he did not know.

John Lusher, the contractor on the gravel job, also approached the scene from the south after the accident; turned off the road about one-quarter mile from the accident, drove on the prairie until he was some 200 to 300 feet from the vehicles, and didn't see the cable "until I walked up to it."

The driver of the next loaded dump truck approaching the area was the decedent. When loaded the truck weighed approximately 41,000 lbs. This was her first job as the driver of a dump truck and she had been on the job some 10 or 12 days. She did not wear glasses and her eyesight was good. The speed at which the truck was being driven as decedent approached was estimated to be somewhere between 19 to 30 miles per hour, and according to Roden decedent did not slow up. There were no marks on the highway to indicate that the brakes had been applied. In the meantime Roden and Rasberry, the two men on the overturned Roden truck, had attached the cable to the truck and had climbed down. Rasberry stationed himself near the front and Roden at the rear. Roden signaled Williams to start "winding" the winch. Normally the operation of righting the truck would require about one-half to one minute but after the truck had been raised to approximately a 45-degree angle with the cable stretched across the road at a height of 5½ feet, the dome of the truck became entangled in a wire fence that was some 17 feet from the west edge of the road. Roden signaled Williams to stop "winding," crossed the fence, and started to untangle the wire when he heard a truck coming over the hill. He then started walking to the rear of the tank truck, and at the time the decedent's truck was one-quarter of a mile or a little less from the tank truck he thought she was going too fast under the conditions. He then crossed the fence, started running toward the road waving his arms, and when he got to the edge of the road the decedent's truck was about 50 yards from him. He did not get on the road for fear of getting run over. When decedent went by him he was standing some 30 feet from the cable and she was sitting "perfectly rigid," looking straight ahead. There was testimony that at the height at which decedent was sitting the background of the cable would be the "dull green" landscape and not the horizon. When the truck decedent was driving came in contact with the cable it came across the hood, sheared through the cab, decapitated Mrs.

Davis, lodged a few feet into the bed of the truck on the left side, and "flipped" the tank truck over on its right side, dragging it forward about 8 feet. It is undisputed that prior to the accident defendants failed to put out "flags" or devices of any kind warning travelers on the road of the dangers ahead and in particular failed to attach to the taut cable completely obstructing the road any flag or sign warning of its presence even though "flags" were readily available in their trucks.

The trial court in reaching its determination on the ultimate issue of liability found, among other things:

"1. The cable stretched across the road by the joint and several negligent acts of the defendants, and their employees, agents and servants, was not in plain sight, obvious, open or apparent to the decedent under the conditions then existing. The testimony of witnesses shows that the decedent was not driving at an excessive speed, did not slow down, and was looking straight ahead. This may be construed as evidence that she did not see the cable for the above reasons, together with other evidence as to the visibility of the cable.

"2. This was a road used by the public, all of which was known or should have been known to these defendants, and particularly known to them that it was being used by gravel trucks such as the one driven by the decedent."

From that it was concluded:

"1. The negligent acts of the defendants were joint and several and were the proximate cause of the accident and the death of Marjorie Faye Davis, and said negligent acts consisted of the following:

"(a) Obstruction of a road used by the public, and not using ordinary, due or reasonable care in the process thereof.

"(b) Failure to adequately warn users of the road, and in particular the decedent, of the cable stretched across it by these defendants.

"(c) Failing to exercise ordinary, due or reasonable care for the safety of the decedent knowing of her approach and use of the road.

"2. Decedent was not contributorily negligent."

The defendant contends that the findings and conclusions of the trial court attributing negligence to the defendant and lack of contributory negligence to the decedent are unsupported by the evidence, are contrary to the evidence, are against the great weight of the evidence, and that the undisputed testimony of plaintiff's own witnesses shows that decedent was guilty of contributory negligence as a matter of law.

In support of the contentions, counsel for the defendant has gone to some length to persuade us that there is no real conflict in the evidence and has proceeded minutely to bring to our attention for reexamination all of the evidence, pro and con, relating to the points raised. Needless to say, we have examined all of the evidence with care, and inasmuch as the trial court called for briefs before reaching its decision we feel rather confident that the trial court also gave careful consideration to the evidence and to the legal principles involved. Concededly, however, the evidence pertaining to the issue of contributory negligence on the part of the decedent raises a close question and for that reason we have heretofore set forth in some detail the evidence we regard as having a material bearing upon such matter. It must nevertheless be kept in mind that even though there is no real conflict in the evidence this court is duty bound to give to the evidence most favorable to the prevailing party every reasonable inference that might be drawn from it in favor of the determination made by the trier of the facts and if such evidence is sufficient the determination will not be disturbed. Berry Refining Company v. Pinsky, Wyo., 443 P.2d 521, 523.

Turning first to the contention and argument that the court erred in attribut-

ing negligence to the defendants and concluding that such negligence was the proximate cause of the accident, we hold it to be without merit. It is predicated upon the proposition that the presence of the vehicles at the scene constituted ample warning to traffic approaching from the south sufficient to give adequate notice of the danger ahead as demonstrated by the fact the truck drivers preceding decedent slowed down sufficiently to enable them to stop if necessary and for such reason flags, a flagman, or other warning device would have added nothing to what was already apparent. The weakness in the argument is that each of those drivers had years of experience and some knowledge that a "rig-up" truck involved the use of a winch and cable whereas a less experienced and less knowledgeable driver without special warning might not grasp the significance of the presence of such a truck and proceed on through when it was observed that the portion of the road being used for travel was clear at that time. In any event, we think the most such evidence tended to disclose was that decedent may have been guilty of contributory negligence, McWhorter v. Draughn, 137 Miss. 515, 102 So. 567, about which we shall have more to say. We hold that the trial court on the basis of ample evidence was warranted in concluding that defendant should have foreseen the danger of entirely obstructing the road by stringing a taut cable between the two vehicles even though the method employed for "righting" the overturned truck would normally be of short duration and the failure to give adequate warning to users of the road of such danger, in addition to the belated efforts of Roden to give warning by waving his arms at the most critical time, was a negligent act.

Turning now to the question of contributory negligence, we have just recently in German v. Holmes, Wyo., 459 P.2d 367, recalled and applied this court's view of longstanding that contributory negligence "does not become a question of law except in the clearest case," and "where different inferences of fact may reasonably be drawn, a question of fact is presented for the trier of the fact to determine." Although defendant makes a valiant effort and presents rather forceful argument to bring this case within the reach of those rare cases such as Hawkins v. Loffland Bros. Co., 70 Wyo. 366, 250 P.2d 498, wherein this court held in effect that a clear case had been made out by the defendant necessitating reversal of a judgment for the plaintiff, or the more recent case of Auflick v. Dickson, Wyo., 439 P.2d 452, wherein this court affirmed the holding by the trial judge that contributory negligence was established as a matter of law, we are not persuaded defendant's purpose has been accomplished. In those cases the accidents happened in the nighttime and the obstructions or partial obstructions on the highway with which plaintiffs had collided were trucks sufficiently lighted —aided in Auflick by other matters—to give adequate warning of existing danger. In none of the cases coming before us have we dealt with circumstances even closely resembling the facts of this case.

The standard of care by which the conduct of decedent must be measured was restated and augmented in the rather recent case of Arbenz v. Bebout, Wyo., 444 P.2d 317, 319–320, wherein it was said:

"Addressing ourselves to the question of negligence, we approve the holding plaintiff cites from Johnston v. Vukelic, supra [67 Wyo. 1, 213 P.2d 925], 213 P.2d at 930:

" '* * * The standard of conduct to which he [plaintiff] should conform is the standard to which a reasonable man would conform under like circumstances. * * * The words "reasonable man" denote a person exercising those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others. * * *'

"And we do not question the philosophy expressed in Prosser, Torts, p. 125 (2d ed.), that:

"' * * * "It would appear that there is not [no] standardized man; that there is only in part an objective test; that there is no such thing as reasonable or unreasonable conduct except as viewed with reference to certain qualities of the actor —his physical attributes, his intellectual powers, probably, if superior, his knowledge and the knowledge he would have acquired had he exercised standard moral and at least average mental qualities at the time of action or at some connected time." ' "

The general duty placed on decedent with respect to lookout was that stated in Feltner v. Bishop, Wyo., 348 P.2d 548, 550, wherein it was said:

" * * * On the other hand, the limit of the operator's duty when lawfully driving is to exercise a diligence commensurate with hazards disclosed under surrounding circumstances, and the lookout which operators of vehicles must maintain is that most effective in the light of all present conditions and those reasonably to be anticipated. * * * "

Keeping in mind that the accident here did not result from obstructions placed upon the road in connection with its repair, it is generally accepted that a driver of a motor vehicle is entitled to assume that all portions of a road intended for travel are reasonably safe, and if not there will be ample warning. 60 C.J.S. Motor Vehicles § 201(4), p. 1015, and the authority then goes on to say, at p. 1016:

" * * * Thus, in the absence of knowledge or notice to the contrary, or unless circumstances are such as should alert him, in the exercise of ordinary care, a motorist is not bound to anticipate extraordinary or unusual hazards, such as dangerous defects or obstructions to which his attention has not been directed and of which he has no warning."

A rather interesting case dealing with the obstruction of a portion of a road under construction by a cable placed there by the contractor is the California case of Tankersley v. Low & Watson Construction Co., 166 Cal.App.2d 815, 333 P.2d 765. There a patrolman patrolling the road by motorcycle ran into the cable and was severely injured. The evidence disclosed that there were several barricades upon the highway advising "caution" and "road closed," which plaintiff passed before reaching the cable. There was no special warning of the presence of the cable, however, and it was held that the issue of contributory negligence was a question of fact for the jury. The standard instruction given on this phase of the case is quite significant. The instruction read:

" * * * 'Inasmuch as the amount of caution used by the ordinarily prudent person varies in direct proportion to the danger known to be involved in his undertaking, it follows that in the exercise of ordinary care, the amount of caution required will vary in accordance with the nature of the act and the surrounding circumstances. To put the matter in another way, the amount of caution required by the law increases as does the danger that reasonably should be apprehended.' * * * " 333 P.2d at 770.

While we previously indicated that the presence of the "rig-up" truck and the overturned truck in the borrow pit was evidence which the trial court was called upon to consider in determining the question of contributory negligence, we cannot, in the light of the foregoing legal principles pertinent to the question, hold that the evidence relating thereto without more established a clear case of such negligence. It is true, of course, that decedent, at the time she came over the hill, was confronted with circumstances even more pronounced indicating difficulty ahead than were the circumstances confronting the other drivers in that the Roden truck had been partially raised. Nevertheless, there is nothing to show that decedent was aware of such changed circumstances. All she knew was that other drivers were returning after

dumping their loads some distance beyond the point of the accident. The trial court might well have reasoned that the circumstances were such as to alert decedent to the possibility of colliding with the Roden truck but were insufficient reasonably to impose upon decedent the duty of anticipating the complete obstruction of the road by the cable. While others might disagree as does the defendant, we are persuaded that the precise question of whether or not the surrounding circumstances in the instant case were such as to give adequate warning of the totality of the hazards ahead was a matter for the trier of the facts to decide.

The defendant also invokes the accepted rule that the failure of a person to see what he could or should see by looking spells negligence and attacks the finding of the trial court that the taut cable "was not in plain sight, obvious, open or apparent to the decedent under the conditions then existing" as being unsupported by the evidence and contrary to the evidence. The basis of defendant's contention is to a great extent predicated upon Peterson's testimony that he saw the cable when it was lying upon the road and up over the Roden truck at a distance of some 400 to 600 feet. We have previously pointed out the inconsistency of Peterson's testimony in this respect as developed by defendant on cross-examination, but aside from that this was not the only testimony pertaining to the matter. The witness Watts, for example, under the same conditions testified that he first saw the cable when he was approximately 50 feet from it. Defendant also lays stress upon the fact certain pictures taken immediately after the accident clearly show the visibility of the cable. However, the record does not show the distance from the cable at which the pictures were taken and it is quite apparent that the background of the pictures was not the same as the background facing the decedent. The pictures were taken against the horizon, whereas the decedent according to the evidence faced the taut cable against the "dull green" landscape.

Considering that the trial court was not bound to accept the estimate of Peterson; that the position of the cable had materially changed subsequent to being observed by Peterson and Watts; that the black cable had twice been dragged across the "damp" roadbed; that the pictures were not conclusive; that the weight of the testimony of the witnesses Skiles and Lusher as to the visibility of the cable subsequent to the accident was for the trial court; and the circumstantial evidence relied upon by the trial court that decedent was "looking straight ahead" and had not slackened her speed as constituting some evidence that she did not see the cable, we cannot hold as a matter of law that the cable was in plain sight and obvious to the extent that decedent was charged with the duty of observing the cable in time to avoid the accident or that there was not sufficient evidence to support the finding.

Lastly, on the question of liability, defendant contends that the only inference which could be drawn from the evidence relating to the speed at which defendant was driving would be an inference that decedent's speed in the light of the attending circumstances was unreasonable. We do not agree. The testimony concerning the matter of speed was based on estimates and varied from 19 to 30 miles per hour. The evaluation of such testimony was the responsibility of the trial court and here again presented a question of fact. Dr. Pepper Company v. Heiman, Wyo., 374 P.2d 206; Henman v. Klinger, Wyo., 409 P.2d 631, 636; Tankersley v. Low & Watson Construction Co., 166 Cal.App.2d 815, 333 P.2d 765, 769.

■ The contention of defendant that the trial court erred in denying a motion for new trial on the ground of newly discovered evidence is not convincing. The newly discovered evidence upon which the motion was predicated related first to evidence of an admission made by plaintiff Harvey Dean Davis to George Mead, the defendant's witness at the trial, that on the morning of the accident Davis had argued

with decedent about personal matters and advised her that he was going to get a divorce, and secondly to evidence impeaching in part the testimony of plaintiff's witness Peterson. In advancing the contention, defendant gives recognition to the prevailing rule that the granting or denial of a new trial on the basis of newly discovered evidence rests largely within the discretion of the trial court and its ruling will not be disturbed unless abused, Opie v. State, Wyo., 422 P.2d 84, 85; also, that a new trial will not be granted unless such evidence would have affected the result of the trial, Farmers' Lumber Co. v. Luikart, 36 Wyo. 413, 256 P. 84, 87 rehearing denied 37 Wyo. 201, 259 P. 1053.

 The proffered evidence of an admission by Davis is apparently offered in part for purposes of impeachment inasmuch as Davis at the trial had testified that he loved decedent very much and that she was a happy person. However, that is of little importance on the question of liability. The main thrust of defendant's argument is that such evidence would tend to show a confused mental state on the part of decedent and as a consequence she was not as observant and attentive as the circumstances confronting her required. In considering the contention it is of importance to note the unusual circumstances under which this claimed admission was brought to the attention of the trial court. It first came before the trial judge in the jury trial on the issue of damages. At that trial defendant's witness Mead testified that Davis, in a conversation with him a short time after the liability trial, said that they (Davis and decedent) "had been talking about a divorce that morning." In rebuttal Davis vehemently denied he had ever made such a statement. Thus the trial court, as the trier of the facts on the liability issue, and prior to the filing of the motion which was supported by an affidavit of one of defendant's counsel, was afforded the opportunity of actually observing the demeanor of the two witnesses involved and to evaluate such evidence at that time. Inherent in the ruling of the

trial court denying the motion for new trial on this phase is the holding that such evidence would not affect the decision previously reached on the issue of liability. We must keep in mind, of course, that the trial judge was in a much better position than is this court to determine the matter, Chandler v. Dugan, 70 Wyo. 439, 251 P.2d 580, 588, and a heavy burden is cast upon defendant to show an abuse of discretion. We question that defendant has met that burden. Our analysis of the record in view of the circumstances is such that we cannot say with assurance the claimed admission was of such probative force as to affect the outcome of the trial or to disclose an injustice. Consequently we cannot hold that the court erred in this respect.

Concerning the evidence relating to Peterson, it is apparent that such evidence was offered merely for purposes of impeachment. We have held that under such circumstances a new trial will not be granted, Opie v. State, supra, 422 P.2d at 86, and such rule is applicable here.

Affirmed.