APRIL TERM, 1945

RAYMOND GAMET, *Plaintiff and Appellant,*

vs.

ELBERT N. BEAZLEY, MERRILL WENHOLZ and
WALTER Q. LARSON, *Defendants and Respondents.*

(No. 2314; June 26th, 1945; 159 Pac. 2d 916)

2 

For the Plaintiff and Appellant the cause was submitted upon the brief of Albert D. Walton, George F. Guy and Ruth N. Edelman, all of Cheyenne, Wyoming, and oral argument by Mrs. Edelman.

For the Defendants and Respondents the cause was submitted upon the brief of Carleton A. Lathrop and Clarence A. Swainson, both of Cheyenne, Wyoming, and oral argument by Mr. Lathrop.

4

## OPINION

BLUME, Chief Justice.

Plaintiff brought this action to recover damages sustained by him in a rear-end collision. Plaintiff's automobile, while traveling westward, struck the automobile of the defendents which was standing still on the road. The court found in favor of the defendents and plaintiff has appealed.

The plaintiff was severely injured. In view of our conclusion herein, however, it is unnecessary to set forth the evidence as to the extent of his injury, or as to what damages he sustained. Aside from that, the testimony is, in brief, as follows:

Both cars wre traveling westward. The collision occurred about 3:30 o'clock in the early morning of October 24, 1941, about six miles west of Rock River, Wyoming, or about 96 miles west of Cheyenne, on a stretch of road which was straight, with a slight incline, for a distance of about one-half a mile to a mile, with a width of 24 feet of oiled road and a shoulder of approximately 2 feet on each side of the main road. The main witnesses in the case were Charles Emslie, who was driving the plaintiff's car at the time of the collision, and Walter Q. Larson, who was driving the car of the defendants at that time. It was a foggy night, the fog extending from Laramie westward to the place of the collision. It was spotty, however, thicker in some places than in others. Emslie stated that it was definitely foggy at the place of the collision; that the visibility extended from 30 to 40 feet. Larson testified that the fog at the place of collision was very thick, the visibility poor, and that one could not see more than about 20 feet ahead. The witness Collier, highway patrolman, testified that the night was foggy, the fog dense in spots, and that the roads

were wet. Hence, there is substantially no conflict on this point.

The car driven by Larson was a four-door Ford Sedan, Model 1937. It was owned by the defendant Beazley, but we shall frequently refer to it as that of the defendants. Beazley was in Los Angeles at the time of the collision. The car had been borrowed from him by the defendant Wenholz who drove it from Los Angeles to Iowa and from Iowa to St. Paul. There he picked up the defendant Larson to travel to California with him and charged him $15.00 for the permission to ride in the car. Starting from St. Paul, they drove day and night, taking turns at driving. Larson drove from Cheyenne to the place of the collision. He testified that the moisture and sleet formed ice on the windshield, making it impossible to drive after a certain length of time without stopping to wipe off the windshield; that the windshield wiper did not keep the windshield clean; that he stopped two or three times after leaving Laramie in order to clean the windshield; that just before the collision, with Wenholz asleep in the front seat, he stopped to clean the windshield, the car resting partly on the road and partly on the shoulder; that before doing so he went to the back of the car. The front and rear lights of the car were on. Within two or three minutes thereafter he saw a car approaching from the East; that he had a flashlight in his pocket, ran some 100 to 150 feet back of his car, waving the flashlight when plaintiff's car went past him. "Q. Did the driver of the other automobile slow down any? "A. No, sir. Q. At what rate of speed was that automobile traveling when it struck your car A. I would say at least 50 miles per hour or better when it passed me. It was going right along." According to his testimony, after the plaintiff's car hit the car of the defendants it went about two car lengths further on. The car of the defendants went 50 feet beyond that, swerved to

the left of the road into a borrow pit, and was facing east when it stopped. The defendants' car was, according to the witness damaged mainly on the left side; the doors were pretty well bound up from the pressure of the impact of the accident, and the trunk door of the car, too, was damaged. According to the witness Wenholz, the front seat of this car was torn loose and upset, and while he had been asleep in the front seat, he found himself, after the collision, in the back part of the car, himself having sustained minor bumps and bruises. The witness Emslie, testifying to the damage to plaintiff's car, stated: "The left running board was mangled and pushed back. The left door would not close and the left front fender and light were demolished and the right front fender was repairable and the light and all ornaments and what-nots on the right side were intact, but the left front light had to be replaced." An itemized repair bill for this car was introduced in evidence showing that it cost the plaintiff $317.53 to have the car repaired. The witness Collier stated that the whole of the front of the plaintiff's car was damaged, the left possibly more than the right; that the striking force against the car of the defendants was about equally distributed across the back, indicating in his judgment that the car of the defendant was wholly on the oiled road, and he stated that he could not find any trace on the shoulder of the road showing the car of the defendants to have been on it partially.

Soon after the collision a bus came along the road, and was stopped by the flashlight already mentioned. It took the parties in both cars to Rock River from which place an ambulance took them to Laramie. Plaintiff and the young woman riding in his car were taken to the hospital. All of the parties were injured to a more or less extent.

According to the witness Charles Emslie, he and the plaintiff Gamet drove in plaintiff's automobile, which

was a five-passenger Chevrolet, Model 1940, from Seattle, Washington, to Graceland College, at Lamoni, Iowa, where the witness had gone to school. On their way back, they took along one Rosemary Klisby, a young lady who had just been graduated from the College. They stopped and slept at Grand Island, Nebraska. They left Grand Island between 6:00 and 7:00 o'clock in the evening of October 23, 1941. The witness and plaintiff had an agreement that they would drive by turns so that one could sleep while the other was driving. Plaintiff drove from Grand Island to Cheyenne, where they arrived shortly after midnight and where they stopped for 15 to 20 minutes. Emslie drove from Cheyenne to the place of the collision while the plaintiff slept in the back of the car in a sleeping bag. Miss Klisby, too, was asleep in the front seat at the time of the collision. He further testified in substance: "Before the two cars came in contact, I saw a flashlight. I was right on it. As I remember it, somebody was out in front wiping off the windshield and the other fellow in the back of the car jumped to one side. I couldn't figure out what the flashlight was. I was driving on the center line and I pulled over to get out of the way. I thought it was a car coming the other way. The light appeared to be in the center of the road. Naturally, I got over and there was the other car. I was right on to this car when I saw the flashlight. The light was possibly 15 or 20 feet behind the car. I don't know where he went to. He jumped out of the way and I hit the other car. The man with the flashlight was not more than 20 feet behind the car. I put on the brakes. I had both feet down and had ahold of the wheel." On cross-examination the witness testified: "Q. Were you slowing down or speeding up before the accident happened? A. Well I was probably going at my foggy speed. Q. What speed was that? A. I don't know—between thirty and forty—not more than that.

Q. About how fast did you drive between Cheyenne and Laramie? A. As far as I remember I never had it over fifty-five and slowed down in foggy spots." On rebuttal, he stated that he drove about 30 miles on hour at the time of the collision. The witness himself was injured to some extent but apparently not seriously. The extent of the injuries to the young lady does not appear. The record shows that the distance between Grand Island and the place of the collision is 446 miles; the distance from Cheyenne to the place of the collision is 96 miles.

The plaintiff contends that the defendant was negligent in stopping his car on the highway contrary to the provisions of Section 72-206, Rev. St. 1931, as amended by Subdivision H of Chapter 71, S. L. of 1933, reading as follows:

"Whenever a vehicle is parked or stopped upon a highway whether attended or unattended during the times mentioned in this section, there shall be displayed upon such vehicle one or more lamps one of which shall be on the roadway side and project a white light visible under normal atmospheric conditions from a distance of five hundred (500) feet to the front of such vehicle and one of which lamps shall project a red light visible under like conditions from a distance of five hundred feet to the rear, except that local authorities may provide by ordinance that no lights need be displayed upon any such vehicle when parked in accordance with local ordinances upon a highway where there is sufficient light to reveal any person within a distance of two hundred (200) feet upon such highway."

There is conflict in the evidence just how far the car of the defendants rested upon the oiled surface of the road in question. But, even according to the testimony of Larson, it rested to some extent on the main part of the road, so that, if the statute just cited applies, the defendants, or some of them, would seemingly have

been negligent, unless as stated by Blashfield, Cyclopedia of Automobile Law, Perm. Ed., Section 1197, a temporary or momentary stopping for necessary purposes is not within the contemplation of the statute as to stopping or parking. We do not find that the foregoing statutory provision was ever directly repealed. However, the Legislature in 1939 by Chapter 126, Section 53, provided:

"(a) Upon any highway outside a business or residence district no person shall stop, park, or leave standing any vehicle whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distancce of 200 feet in each direction upon such highway.

(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

The Chapter purports to be "an act regulating the traffic of motor vehicles on highways," and appears to recognize the fact that few, if any, owners of automobiles carry lamps such as described in Subdivision H, of Chapter 71, S. L. of 1933, and that at times it is impracticable to remove the automobile from the highway when stopping temporarily. Counsel for plaintiff, apparently assuming that the only statutory provision applicable herein is Subdivision H of Chapter 71 of S. L. of 1933, do not discuss the provisions of Section 53 of Chapter 126 of S. L. of 1939, and counsel for the defendants, apparently assuming that only the last mentioned provision is applicable herein, do not refer to

the statutory provision relied upon by the counsel of the plaintiff. Such procedure does not, of course, give any help to this court in attempting to solve the point as to which, if either, of the statutory provisions apply. We, accordingly, should, if we can, avoid passing on that point. We think we may do that in this case. If the plaintiff was negligent and his negligence contributed to his injury and damage, then he cannot recover, and, under the circumstances of this case, we think that the negligence of Emslie was imputable to the plaintiff. Blashfield, supra, Sections 2493-2494. In fact, counsel for the plaintiff do not contend the contrary.

The question then before us is as to whether or not the trial judge was justified in upholding the contention of the defendants that Emslie was negligent in running at the rate of speed shown by the testimony. It is not what counsel for the plaintiff might think about it, nor what this court might think about it, but whether or not the trial judge might not reasonably conclude that under the circumstances Emslie should have been more careful, and that had he been so the collision would not have occurred. Larson testified that he had been running at 20 miles an hour. In view of the fog, we could not say that this was too low a speed to constitute negligence. And, accepting for the moment the testimony of Emslie that he might have been running at 40 miles an hour, it is quite apparent that he would soon have overtaken Larson and the collision probably would have occurred even with Larson driving instead of standing still, if Emslie could not see any better than he said he could see. That would have been true much more if Emslie traveled at the rate of 50 miles per hour, though in either case the impact might not have been so severe. In other words, we are hardly justified in concluding that the collision would not have occurred even though Larson had not stopped

on the highway. Furthermore, this court is not the judge of the credibility of the witnesses. The trial court had the right to believe Larson that he went from 100 to 150 feet back of the car which he was driving, waving a flashlight, and that Emslie was driving at the rate of fifty miles per hour. In view of the terrific impact of the cars, the distance in which the plaintiff's car and the car of the defendants traveled thereafter, and in view of the injuries sustained by the various parties, we cannot say that the testimony of Larson as to the speed was so unreasonable as to warrent its rejection. Nor can we say that his testimony as to the distance that he was behind the car, waving the flashlight, should have been rejected, particularly in view of Emslie's testimony. Emslie stated that the visibility was from 30 to 40 feet, —still he apparently made no effort to stop his car until he saw the flashlight, and he claimed that that was not more than 20 feet behind the car of the defendants. So his testimony was not quite consistent, and the court had a right to credit that of Larson. And if the latter waved the flashlight from 100 to 150 feet back of the car of the defendants, as he testified, then we cannot say that the court could not reasonably find that the collision could have been avoided by Emslie. The record does not disclose how soon, at the rate at which plaintiff's car was traveling, it could have been stopped. We find it stated in Goodman v. Wisby, 152 Kan. 341, 103 P. 2d 804, that the car in that case, if traveling at 40 miles per hour, could have been stopped in 50 feet; if traveling at 30 miles per hour, in 25 feet. Assuming that to be approximately true in this case, it is quite clear that if Larson's testimony is anywhere near the truth, then Emslie could have avoided the collision if he had traveled at the rate of speed to which he testified, and the collision then occurred because of a speed greater than that which he was willing to admit. See Table of Speed

and Stopping Distances, p. 6, 1945 Supplement in Huddy Automobile Law (9th Edition). The testimony also shows that the lights of the car which Larson was driving were on, both in front as well as in the rear. These on a clear night would ordinarily be sufficient to give travelers on the highway warning of a car ahead. Why should they not be sufficient on a foggy night, if the rate of speed at which the later car is traveling is properly correlated to the circumstances confronting the parties? Furthermore, Larson testified that he had to stop two or three times between Laramie and the place of the collision in order to wipe off his windshield. It would not be an unreasonable inference that the car which Emslie was driving was troubled likewise. If so, he should, in the exercise of reasonable care, have correlated the rate of speed to meet that special situation. These facts would seem to indicate quite clearly that this court would not be warranted in holding that Emslie was, as a matter of law, exercising due care, even if it were true, as he stated at one time, that he was driving at the rate of 30 miles per hour. A traveler with an automobile on the highway is bound to exercise reasonable care. Section 27 of Chapter 126, S. L. of 1939 provides for certain rates of speed, fixing 60 miles per hour as the maximum speed on a highway outside of a city, and then proceeds to state in Subdivision C as follows:

"(c) The fact that the speed of a vehicle is lower than the foregoing prima facie limits shall not relieve the driver from the duty to decrease speed where any hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care."

In Pierce v. Bean, 57 Wyo. 189, 115 P. 2d 660, we held

that the trial court was justified in holding a speed of 25 miles per hour to be negligent in view of the fact that the road was icy and the vehicle was without chains. In Jones v. Rogers, 108 Pa. Super. Ct. 517, 105 Atl. 509, it was held that the jury were justified that a speed of 15 to 30 miles an hour was a negligent speed, when driving at night in a fog. In Caulder v. Gresham, 224 N. C. 402, 30 S. E. 2d 312, a speed before daylight, in a fog, of 30 to 35 miles per hour was held to be negligent. For other cases involving driving through a fog see Blashfield, supra, Volume 1, Section 742. Some of the cases cited are decided under the rule which Blashfield, supra, Section 741, states to be the great weight of authority, namely, that a driver is negligent if he proceeds at such a speed in the dark that he cannot bring his automobile to a standstill within a distance that he can plainly see objects or obstructions ahead of him by the light of his own lamps or other available light. Other cases, as stated by the author, in the same section do not adopt so rigid a rule. They hold, as stated by the author, that: "The standard of care to be exercised in driving an automobile at night is one for the trier of the facts, in the absence of any standard derived from express legal enactment or the universal practice and custom of the community." It is not, we think, necessary to determine whether we should adopt the rule first mentioned. The second of these rules will meet the purposes of this case. In Murphy v. Hawthorne, 117 Or. 319, 244 P. 79, 44 A. L. R. 1307, for instance, plaintiff, driving at night, at the rate of about 25 miles per hour, found a truck parked on the right hand side of the road without lights. He collided with it. It was contended that he was guilty of negligence as a matter of law in failing to stop his automobile within the range of his vision. The court held that he should not be held guilty of negligence as a matter of law, but that the question of his negligence

was a matter of fact to be resolved by the jury. So in the case at bar, whether or not Emslie was negligent was, we think, a question of fact, properly left to the trial court to decide. It decided against the plaintiff, and we find no justification, either under the facts or the law, to reverse that finding. Other questions raised herein need not be mentioned. The judgment herein should, accordingly, be affirmed and it is so ordered.

RINER, J., and KIMBALL, J., concur.