**Victor L. ENGLAND and Frances England, Husband and Wife, Appellants (Plaintiffs),**

v.

**Phil O. SIMMONS and Kissack Water and Oil Service, Inc., Appellees (Defendants),**

**Michael E. Barnes and Apollo Drilling Company, (Defendants).**

No. 86–74.

Supreme Court of Wyoming.

Dec. 1, 1986.

Rehearing Denied Dec. 22, 1986.

**1138**

William D. Omohundro and Randall T. Cox, of Omohundro and Palmerlee, Buffalo, for appellants.

J. Scott Burnworth of Schwartz, Bon, McCrary & Walker, Casper, for appellees.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT, and MACY, JJ.

BROWN, Justice.

Appellants Victor L. England, and Frances England, his spouse, filed a complaint alleging negligence and/or willful and wanton conduct on the part of Phil O. Simmons, Kissack Water and Oil Service, Inc., Michael E. Barnes and Apollo Drilling Company after Victor England was injured in an automobile collision.[1] On July 3, 1985, the district court denied appellants' motion to amend their complaint in order to join additional parties. Subsequently, on October 1, 1985, the district court entered a summary judgment in favor of appellees, determining that no genuine issue as to any material fact existed. On appeal two issues are raised:

1. Did the district court abuse its discretion by refusing leave to appellants to amend their complaint and thereby add other individuals as defendants?

2. Did the district court abuse its discretion in determining that no genuine issue of material fact existed concerning appellees' negligent and/or willful and wanton conduct and in entering summary judgment in favor of appellees?

We will affirm.

On September 26, 1983, Phil Simmons was driving east on Iberlin Road, a gravel road in Campbell County, in a 25-ton water truck owned by Kissack Water and Oil Service, Inc. A southerly wind that day caused a dust cloud to trail Simmons' vehicle. The cloud covered the lane of traffic to the rear and immediate left of an eastward-bound truck for a period of time. Michael Barnes, an employee of Apollo Drilling Company, entered the Iberlin Road behind Simmons' truck. He was driving a

---

1. Michael E. Barnes and Apollo Drilling Company were dismissed with prejudice on February 4, 1986, pursuant to a stipulation and order by the district court.

crew cab pickup and followed behind Simmons. Meanwhile, Victor England drove his pickup truck with his co-worker Anthony Bentley in the opposite direction toward Simmons and Barnes.

The Barnes' vehicle attempted to pass Simmons, entering the dust cloud into the passing or lefthand lane and collided with the England vehicle. Both vehicles were substantially destroyed, and several persons were injured.

The only dispute concerns what part the Simmons' truck played in the accident. Appellants contend that Simmons waited until he was very near England to flash his brake lights and pull to the righthand side of his lane—giving Barnes the "do pass signal"—and thereby negligently and/or willfully and wantonly caused the accident. Appellants joined Simmons' employer, Kissack Water and Oil Service, Inc., via use of a respondeat superior theory. Conversely, appellees state that immediately before the England truck came even with the front of the water truck in which Simmons was driving, Simmons looked in his right rearview mirror and realized that Barnes was no longer behind him. Only after realizing that Barnes was trying to pass him with an oncoming vehicle approaching did Simmons hit his brakes and pull to the right edge of the road in an attempt to prevent an accident.

I

Appellants maintain that the district court abused its discretion by refusing to permit joinder of other individuals as defendants in this case. On June 24, 1985, appellants sought to amend their complaint to add the individual officers of Kissack Water and Oil Service, Inc., one of the then existing parties, as defendants. However, October 24, 1985, the district court denied that motion giving no authority or reasoning for doing so.

In determining whether a joinder of parties should be allowed, the rule provides:

"(a) * * * All persons may be joined in one (1) action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. * * *

"(b) The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him, and may order separate trials or make other orders to prevent delay or prejudice." Rule 20, Wyoming Rules of Civil Procedure.

Rule 20, Federal Rules of Civil Procedure, which is identical to Wyoming's rule, is explained in 7 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1653 and 1660. It is stated at § 1653, p. 382:

"Instead of developing one generalized test for ascertaining whether or not a particular factual situation constitutes a single transaction or occurrence for purposes of Rule 20, the courts seem to have adopted a case by case approach. As stated by one district court judge:

"there can be no hard and fast rule, and that the approach must be a general one of whether there are enough ultimate factual concurrences that it would be fair to the parties to require them to defend jointly [the several claims] against them * * *."

And at § 1660, pp. 436–438:

"The general philosophy of the joinder provisions of the federal rules is to allow virtually unlimited joinder at the pleading stage but to give the district court discretion to shape the trial to the necessities of the particular case. *Rule 20(b) furthers this policy by giving the court authority to order separate trials or make any other order to prevent a party from being embarrassed, delayed, prejudiced, or put to unnecessary expense by joinder of a party * * *.*

"In addition to safeguarding the interests of the parties, the provision furthers

trial convenience by granting the court discretion to sever multiple issues that technically may be joined in one action under liberalized joinder rules but that could be determined more conveniently and expeditiously in separate trials. * * *The district court's decision on the issue of separate trials will not be disturbed on appeal except in the rare case when a clear abuse of discretion can be shown.* (Emphasis added.)

See also, *State, by and through Christopulos v. Husky Oil Company of Delaware*, Wyo., 575 P.2d 262 (1978).

This court has defined abuse of discretion numerous times. Recently, we said: " 'A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. * * ' *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

\* \* \* \* \* \*

"Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985).

\* \* \* \* \* \*

" * * * Each case must be determined on its peculiar facts. * * * " *Martin v. State*, Wyo., 720 P.2d 894, 896–897 (1986).

Here, appellants contend that the only plausible explanation for denial of the motion to join additional parties was to prevent delay in trial. The order denying joinder states no rationale or basis for denial.

"Our consideration is limited to a determination of whether the trial court was clearly wrong in denying this motion, *Turnbough v. Campbell County Memorial Hospital* [Wyo., 499 P.2d 595, 597 (1972) ]; and we cannot consider the contentions asserted by appellant in attacking the * * * judgment, *Brennan v. Midwestern United Life Insurance Company*, 7 Cir., 450 F.2d 999, 13 A.L. R.F. 243 [1971], certiorari denied 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 [1972]." *Martellaro v. Sailors*, Wyo., 515 P.2d 974, 976 (1973).

■ It should be noted that Rule 20, W.R.C.P., is entitled *"permissive* joinder." (Emphasis added.) Under our statutes relating to joinder, the trial court is entitled to exercise considerable discretion in determining who should be joined or retained. *Casper National Bank v. Jones*, 79 Wyo. 38, 329 P.2d 1077 (1958).

■ After careful review of the record, we conclude that any one of the reasons under Rule 20(b), W.R.C.P., may be a plausible reason for denial of joinder. Conjecture by this court as to the specific ground for denial is not required. After applying the current definition of abuse of discretion and its standard of review, we give due deference to the district court judge and his denial of joinder of the parties.

## II

Appellants contend that the district court erred in determining that no genuine issue of material fact existed concerning appellees' negligence and/or willful and wanton conduct in entering its summary judgment in favor of appellees. Further, they argue that whether or not appellees proximately caused the collision is a question solely for jury consideration. Therefore, appellants propose that the district court erred as a matter of law.

According to Rule 56(c), W.R.C.P., a summary judgment

" * * * shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * * "

The purpose of summary judgment is to eliminate formal trials where only questions of law are involved, *Johnson v. Soulis,* Wyo., 542 P.2d 867 (1975), and to pierce the formal allegations and reach the merits of a controversy where no material issue of fact is present. *Siebert v. Fowler,* Wyo., 637 P.2d 255 (1981). Where there are genuine issues of material fact, summary judgment is improper, but the purpose behind summary judgment would be defeated if a case could be forced to trial merely by asserting that a genuine issue of material fact exists. *Duffy v. Brown,* Wyo., 708 P.2d 433 (1985); and *Johnson v. Soulis,* supra.

*Garner v. Hickman,* Wyo., 709 P.2d 407, 410 (1985), states our applicable standard of review:

"When reviewing a summary judgment on appeal, we review the judgment in the same light as the district court, using the same information. *Randolph v. Gilpatrick Construction Company, Inc.,* Wyo., 702 P.2d 142 (1985); and *Lane Company v. Busch Development, Inc.,* Wyo., 662 P.2d 419 (1983). A party moving for summary judgment has the burden of proving the nonexistence of a genuine issue of material fact. *Dudley v. East Ridge Development Company,* Wyo., 694 P.2d 113 (1985). Material fact has been defined as one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Samuel Mares Post No. 8, American Legion, Department of Wyoming v. Board of County Commissioners of the County of Converse,* Wyo., 697 P.2d 1040 (1985). Upon examination of a summary judgment, we view the record from the vantage point most favorable to the party opposing the motion, giving him all favorable inferences which may be drawn from the facts. *Bancroft v. Jagusch,* Wyo., 611 P.2d 819 (1980)."

See, *Ward v. First Interstate Bank of Riverton,* Wyo., 718 P.2d 886 (1986); and *Toltec Watershed Improvement District v. Johnston,* Wyo., 717 P.2d 808 (1986).

Appellants argue that questions of material fact exist as to determining the negligence and/or willful and wanton conduct on the part of appellees. However, the material appellants rely on points to no such genuine issue as we apply our applicable standard of review.

As stated in *Beard v. Brown,* Wyo., 616 P.2d 726, 734 (1980):

"Negligence consists of (1) a duty, (2) a violation of the duty, (3) proximately causing, (4) the injury. *Danculovich v. Brown,* Wyo.1979, 593 P.2d 187. The duty referred to is a 'legal' duty, the definition of which is for the court as a matter of law. *Lemley v. United States,* D.C.N.D.W.Va.1970, 317 F.Supp. 350, aff'd. 4th Cir.1971, 455 F.2d 522; *Guinand v. Atlantic Richfield Co.,* 10th Cir. 1973, 485 F.2d 414; *Maxted v. Pacific Car & Foundry Co.,* Wyo.1974, 527 P.2d 832. A legal duty is an obligation, the performance of which is required by law. *Cleveland, C., C. & St. L. Ry. Co. v. Ballentine,* 7th Cir.1898, 84 F. 935; Prosser, Torts, 4th ed., p. 206 (1971)."

One authority has stated the following regarding the duty owed by a leading vehicle to the driver of a following vehicle:

"Except as may be provided by statute, the driver of a leading vehicle owes no duty to to use the road in the usual way in keeping with the laws of the road. "When one knows of the approach of a following vehicle, there is the duty of ordinary care for the approaching driver's safety." Blashfield, Automobile Law and Practice § 113.3, p. 668 (1979).

Section 31–5–203(a)(ii), W.S.1977 (Nov. 1984 Replacement), provides, "Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle." The record clearly shows that no audible signal was given and that Simmons was either decelerating or stopped at the time of the accident. Therefore, it seems Simmons was entitled to drive on the Iber-

lin Road and was under no legal duty to stop and allow Barnes to pass.

Furthermore, as indicated by the record, Simmons had no hint that Barnes was going to attempt to pass him until just immediately before the accident occurred; and he was under no duty to anticipate Barnes' negligent attempt to pass his vehicle. The driver of the leading vehicle is entitled to assume the driver of an overtaking vehicle will observe traffic regulations and exercise due care in attempting to pass another vehicle. Blashfield, Automobile Law and Practice § 113.22. Moreover, a driver of a vehicle is not bound to anticipate the negligence of another driver. *Brockett v. Prater,* Wyo., 675 P.2d 638 (1984).

Appellants contend that Simmons negligently signaled Barnes that it was safe to pass. Simmons states that he did not hit his brakes or pull to the ri ght until after he saw that Barnes was no longer behind him.[2] In any event, it makes little difference, in that,

> "[t]he driver of the overtaking vehicle should be able to see a sufficient distance ahead on the left side of the roadway as to prevent running into an object on that side of the road. Before the driver of a vehicle turns to the left to pass another vehicle going in the same direction, such driver owes the duty to observe whether there is any oncoming traffic which in the circumstances might constitute a possible danger." Blashfield, Automobile Law and Practice § 112.8, p. 624 (1979).

Furthermore, § 31–5–204, W.S.1977 (Nov. 1984 Replacement), states:

> "No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit the overtaking and passing to be completely made without interfering with the operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to an authorized lane of travel as soon as practicable and in the event the passing movement involves the use of a lane authorized for vehicles approaching from the opposite direction, before coming within two hundred (200) feet of any approaching vehicle."

The sole duty of ensuring that the passing lane was clear from oncoming traffic was upon Barnes, the driver of the passing vehicle. Simmons was under no such legal duty.

Appellants also argue that Simmons was negligent in causing the dust cloud which impeded Barnes' view in the passing lane. As pointed out in *Beard v. Brown,* supra, no duty arises which obligates one to keep a dirt road dust free. One simply cannot logically assume that duty. Common sense must be used.

The only way anyone could keep the road dust free would be to pave it. Even then, in a hot and windy locale, dust could be blown across the road in considerable volume. The requirement of keeping a dirt road free of dust is almost impossible.

Any person who drives on a dirt road is aware that a dust cloud might arise. As pointed out previously, if a person desires to pass another through a dust cloud it is his sole duty to ensure that the passing lane is clear before passing. We hold that a vehicle is not under a duty to drive on a dirt road without creating dust or to stop each time a vehicle approaches to allow his dust cloud to dissipate. This obviously would bring traffic to a standstill.

In summarizing the record, taking into account all that which was before the district court, we find that appellee Simmons was driving within the speed limit, in his own lane of traffic, and in control of his vehicle while on a public road. The actions of Simmons while driving the Kissack water truck at the time of the accident violated no duty owed to plaintiff-appellants.

---

**2.** Simmons may have slowly decelerated and moved slightly to the right in order to accommodate the oncoming vehicle out of common roadside courtesy.

Therefore, under the applicable summary judgment review, we find that no genuine issue as to any material fact exists. Simmons did not act negligently, was not the cause in fact of the accident, nor was he in any way the proximate cause of the accident. Clearly, there is no need to overburden the issue of wanton and willful conduct on the part of Simmons.

Giving the district court decision the due deference that is prescribed by law, the judgment is affirmed.

Affirmed.

URBIGKIT, Justice, dissenting.

I dissent from Section II of the court's opinion. The present decision of this court to affirm summary judgment in favor of defendant Simmons and his employer is apparently premised on the existence of a dispositive legal principle for summary judgment, *Cordova v. Gosar*, Wyo., 719 P.2d 625 (1986) (Category 5 summary judgment), and the absence of an issue of fact, *Cordova v. Gosar*, supra (Category 6 summary judgment).

I find the decision of the court faulty in delineating the contested and established facts, and also wrong in applying the legal standard of conduct for passed and passing vehicles under Wyoming motor vehicle law.

What this case really presents as a factual panorama, at least as subject to determination by an inquisitive and knowledgeable Wyoming jury, is a road-hog, Phil Simmons, driving a big truck in the middle of the road, denying to a following vehicle, Michael Barnes, the opportunity to see in front or to pass. Simmons moved to the right, and Barnes misinterpreted this act to be Simmons' sudden recognition of the statutory right to pass or normal courtesy of the road. Unfortunately, Simmons' movement to the right of the road was to avoid hitting an oncoming vehicle head-on rather than a courtesy to a following vehicle. By misinterpreting courtesy for necessity, and by reacting wrongly, Barnes rather than Simmons hit head-on the oncoming vehicle driven by the unfortunate Victor England.

The court errs in logic and legal conclusion by its failure to recognize and apply those explicit Wyoming statutes relating to driving conduct and accepted standards as generally would be applied by juries for consideration of the facts of this specific occurrence. The majority's disposition by summary judgment of the plaintiff's complaint *on denial of both a duty and resulting damage recovery* is wrong as a matter of law. Furthermore, and even if the statement of facts included in the majority opinion is taken as the testimony of defendant, which is subject to a question of completeness, other testimony in the record raises a clear issue of fact deserving jury resolution. Disposition by summary judgment *based on the absence of factual conflict* is also wrong.

FACTS

According to Simmons' affidavit and deposition, Iberlin Road in Campbell County is an oil field access county road, gravel and dirt surfaced, with a travel width of approximately 28 feet. Simmons was driving an International semi tractor truck with a fifth wheel 130 barrel water trailer. Simmons, age 21, had been driving since he was 16, had received seven driving citations prior to this incident, and received three more citations since the accident. He was employed by Kissick Water and Oil Field Service without inquiry about his driving record.

At the time of the accident Simmons was hauling salt water from well sites to a disposal plant operated by the employer. He was working ten- to fifteen-hour shifts, driving two or three five-hour trips a day, each trip consisting of approximately fifty miles from disposal site to collection point (two to three hundred miles primarily on the county dirt road).

Simmons was traveling in an easterly direction on Iberlin toward his starting point, while a wind blowing from the south created a cloud of dust behind his truck in the westerly lane of traffic. The dust cloud was described by Simmons as so

"thick [that] you could not see through it." At the accident scene the road was straight and apparently level, although there were general grades at other points in the nature of Campbell County's rolling hills country.

The vehicles involved in the accident were the eastbound pickup, driven by Barnes and containing a drilling-rig crew finished with their work shift, and a westbound pickup driven by plaintiff England. The time was midafternoon, and no weather or site contribution factor was involved, except the strong south wind and vehicle-created dust cloud.

Simmons testified:

"A. And just before Totem met me, I looked in my right rearview mirror to see where this rig crew was, and I couldn't see them. So I hit my brakes and got over to the side of the road, the right-hand side of the road, as far as I dared. And about that time Totem had started in the dust cloud, and the next thing I knew, I seen the back end of the Barnes' pickup in my right rearview mirror.

"Q. Was that after the impact?

"A. Uh-huh.

"Q. So you saw the Barnes' pickup quite a bit of time before you saw the Totem pickup?

"A. Uh-huh.

"Q. For purposes of this discussion and this record, the Totem pickup was driven by Mr. England. You remember that?

"A. Uh-huh.

\* \* \* \* \* \*

"Q. How long would you say that the Barnes' pickup followed you?

"A. He was behind me approximately four miles.

"Q. Four miles. How close was he behind you during that period of time?

"A. He would get right up on me at some points.

"Q. And then drop further back?

"A. Yeah.

"Q. And move back and forth?

"A. (The witness nodded.)

"Q. In and out of the dust cloud?

"A. No, he wasn't in the dust cloud until he went around, go around me.

"Q. I see. The dust cloud was to your left?

"A. Uh-huh.

"Q. There was no dust to your right?

"A. Huh-uh.

"Q. And that's because the wind was blowing?

"A. Uh-huh.

"Q. So he would pull up close and then he would drop back and then pull up close and then drop back, would that be correct to say, for a period of about four miles?

"A. Uh-huh.

"Q. And how close would he get when he pulled up?

"A. Two car lengths behind me at the most.

"Q. *Did it appear to you that he wanted to get past you?*

"A. *Uh-huh.*

\* \* \* \* \* \*

"Q. Did you feel an accident was going to happen and you just didn't know how to avoid it; is that what you're telling me?

"A. Uh-huh.

\* \* \* \* \* \*

"Q. Why did you think an accident was about to happen?

"A. Because I knew Barnes was behind me before that, and I couldn't see him.

"Q. You also knew that England was approaching from the opposite direction, didn't you?

"A. Yeah.

"Q. And you also knew that there was a cloud of dust being kicked up by your truck, that Barnes couldn't see England and England couldn't see Barnes. You knew that, didn't you?

"A. Yeah.

\* \* \* \* \* \*

"Q. Is it your testimony, then, that at all times prior to this accident you were

on your right-hand side of the road and you were not in the middle of the road?

"A. No, I wasn't in the middle of the road.

"Q. Is it pretty common practice in the oil field that when you approach a—well, let's take from your standpoint where you are driving a large truck and you see a car approaching you from the rear. Is it fairly common practice that you slow down and pull to the right when it's clear for the other car to pass you?

"A. Yeah.

"Q. And that's your practice and that's the standard practice; is that correct?

"A. Yeah.

"Q. And you wouldn't do that unless it was clear to pass; would that be correct?

"A. Right.

"Q. But you did do that in this case; is that correct?

"A. That I what?

"Q. You slowed down in this case and you pulled to the right immediately before the accident; is that correct? That's what you stated earlier, I thought.

"A. Just as England was meeting me.

"Q. Right. Now, why did you do that?

"A. So he would have plenty of room on the road to get through my dust cloud." (Emphasis added.)

From the foregoing we can conclude with certainty that wherever he was located on the road's 28–foot surface, Simmons pulled to the right immediately before meeting the approaching England so that England had clearance to pass, while England had nearly stopped in pulling to the edge of this wide road as safety from the oncoming Simmons vehicle.

"Q. Okay. You had said that you had had Mr. Barnes behind you for approximately four miles, which assuming your speed at, say, 30, we're talking about a good eight minutes or so that he was behind you. *Was there no opportunity at any time during that eight minutes to pull over?*

"A. *No. I could have pulled over.*" (Emphasis added.)

However we evaluate all testimony in its entirety, as detailed in deposition and affidavit, it is also appropriate to rigorously analyze conclusions of law of this court in light of the relevant statutes, which include § 35–10–401, W.S.1977, 1986 Cum.Supp.:

"(a) If any person, company or corporation shall obstruct or injure or cause or procure to be obstructed or injured, any public road or highway, or common street or alley of any town or village, or any public bridge or causeway, * * * or shall continue such obstruction, so as to render the same inconvenient or dangerous to pass * * *; every person, company or corporation so offending, shall upon conviction thereof, be fined not exceeding one hundred dollars ($100.00); and every such nuisance may, by order of the district court before whom the conviction may take place be removed and abated by the sheriff of the proper county.",

§ 31–5–201(a) and (b), W.S.1977, 1984 Replacement:

"(a) Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:

"(i) When overtaking and passing another vehicle proceeding in the same direction under the rules governing the movement;

"(ii) When a stationary obstruction exists making it necessary to drive to the left of the center of the highway but any person so doing shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard;

* * * * * *

"(b) Upon all roadways except one-way streets any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand

curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into an alley, private road or driveway.",

and, finally, § 31–5–203, W.S.1977, 1984 Replacement:

"(a) The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions and special rules hereinafter stated:

"(i) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle;

"(ii) Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle."

A detailed review of the record demonstrates that in driving behavior and attitude Simmons was accident prone and negligently careless in his driving conduct. Rather than absolving risk-producing behavior in driving a dangerous instrumentality, I consider the real issue in this case to involve liability to a third party to whom the defendant contributed no direct danger except as his driving violations motivated the conduct of another driver who then collided with the plaintiff, resulting in injury and damage. Perhaps there is a question as to the application of foreseeability, *Palsgraf v. Long Island Railway Co.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), but surely there is no question as to the defendant's driving behavior and consequent actual physical "cause."

## SUBSTANTIAL AND SUBSTANTIVE EVIDENTIARY CONFLICT DISPOSITION

As a summary-judgment subject, some consideration of the testimony of the other witnesses as reflected by depositions and affidavits is authoritatively justified. Barnes testified:

"A. * * * I was just a few miles from the rig, and I got behind a water truck and stayed behind him for a while. And he was in the middle of the road. So I moved off to the right shoulder of the road so he could see me in his mirror.

"And I'm sure that he saw me, because as soon as I saw him, you know, facing, you know, facing towards the mirror, he moved over to the side. And I didn't pass him right away. But after he was clear over to the side, I was still trying to look around him, but it was too dusty. But I took it that he was giving me the okay to pass, so I went out around him. And I guess about halfway or half the length of the truck is when I hit the other guy.

   *     *     *     *     *     *

"A. * * * The water truck was in the middle of the road, and I went, you know, to the side of the shoulder, and I couldn't see much around.

"Q. You went to the side, the right-hand side?

"A. The right-hand side, yeah, so he could see me, because the dust was pretty bad on the left side. And I won't say that he did see me, but I thought for sure that he did at the time, because as soon as I thought that he had seen me, he moved over on the side of the road. * * *

   *     *     *     *     *     *

"Q. Now you say the water truck was in the middle of the road as you were following him; is that right?

"A. Yes, sir.

"Q. Isn't this road wide enough for two cars to pass?

"A. It is.

"Q. So it's a two-lane road; is that correct?

"A. Yes, sir.

"Q. Why was the water truck in the middle of the road, if you know?

"A. I don't know.

"Q. There was no reason—

"A. No, no reason.

"Q. —for him to be in the middle of the road, was there?

"A. No.

"Q. And the dust cloud that the water truck was kicking up, there was just no way to see through it?

"A. No.

"Q. Either the right-hand side or the left-hand side of the vehicle?

"A. The right-hand side was pretty clear; it was just the left side that you couldn't see too well.

"Q. Could you see around the vehicle, the water truck, if you went over to the right?

"A. Yeah, I could have, if he would have stayed, you know, more to the middle of the road. But as it was, he turned or went off to the right side.

\*    \*    \*    \*    \*    \*

"A. \* \* \* It's common courtesy in the oil field for any kind of truck, big or small, if a guy is going to be poking along, you know, and everything is going good, just move over to the side, pull over, or even stop, and let somebody around him.

"Q. That's not only common courtesy, that would be a safe practice, wouldn't it?

"A. Yes, sir."

From the summary-judgment status of this case, it is assumed by the parties and reasonably demonstrated by the evidence that Barnes was negligent as to England in attempting to pass Simmons when he did. See §§ 31–5–204 and 31–5–205, W.S.1977, 1984 Replacement.

Ludeman, who was in the passenger side of the Barnes vehicle, added:

"Q. So you just remember approaching the truck, and at that point as you approached the back of the truck you couldn't see around the truck; is that correct?

"A. Yeah. You could say that, yeah.

"Q. Now, tell me as best you can remember and as specifically as you can remember exactly what happened as he approached the rear end of that truck.

"A. Mike said something, but I don't remember what he said. Anyway, it had to do with passing the truck or what the truck was doing. And I looked and I could see his brake lights on.

"Q. You could see the truck's brake lights?

"A. Yeah, on the passenger's side, because the driver's side was in the dust.

"Q. Okay. So you could only see basically half of the truck?

"A. Right.

"Q. So it was a pretty thick dust cloud at that point then, wasn't it?

"A. Yeah, right behind the truck it was, yes. And as he—as the truck pulled off the road, we figured he was letting us by.

"Q. Did the truck pull to the right?

"A. To the right.

"Q. And did you notice if the truck slowed down any?

"A. Yeah, he had his brake lights on. He was slowing down because Mike was slowing down. We had followed him for a while.

"Q. Okay. So you say the one brake light and you saw the truck pull to the right?

"A. Uh-huh.

"Q. And did you say anything to Mr. Barnes?

"A. Yeah.

"Q. Or did he say anything?

"A. I said he was pulling over. I said, 'His brake light is on and he's pulling over.'

\*    \*    \*    \*    \*    \*

"Q. And the brake lights stayed on all that time?

"A. While I was looking at them, yes, they were on.

"Q. Did it appear to you that the truck was continuing to slow down?

"A. Yeah, it looked to me like he was pulling over to let us around is exactly what it looks like."

Apropos of the status of the deposition evidence, it is noteworthy that England saw Simmons for about a half mile before the accident and Simmons only saw England for a "hundred yards."

With the foregoing as a general indication of the factual state of the record, it is now necessary to examine the two bases on which the majority justify summary judgment: (1) no issue of fact existed for jury determination;[1] and (2) Simmons was not liable to England as a matter of law because he owed no duty to ensure Barnes a fair opportunity to pass in order to avoid endangering the oncoming vehicles.

It is inappropriate to say as a determined fact that Simmons was driving in the middle of the road even in the face of the probability factors existent, but certainly the status of an evidentiary conflict cannot be questioned. I do not doubt that a jury familiar with Wyoming's geography could find that Simmons was driving in the middle of the road for the distance of between a half mile and four miles, and that the Barnes pickup followed the semi truck loaded with salt water in a continued effort to pass the slower-moving truck. Consequently, any justification for disposing of this case by summary judgment on the absence of an issue of fact lacks support in the record. I find a decision on this category of summary judgment similar to *Toltec Watershed Improvement District v. Johnston*, Wyo., 717 P.2d 808 (1986), again demonstrating that an overbroad summary judgment analysis which includes an evaluation of the presence of factual issues is inapposite where summary judgment is re-

ally being decided on a dispositive question of law. See *Cordova v. Gosar*, supra.

## LEGAL CAUSE REQUIRING DENIAL OF SUMMARY JUDGMENT

The principal issue of this case is whether a driver who fails to observe statutory requirements to afford an opportunity for a following vehicle to pass, incurs a zone of liability to an oncoming vehicle when the passing and oncoming vehicles collide without impacting the slower-moving passed vehicle. It would be reasonable for the jury to find that the driver of the slower-moving vehicle does have a duty imposed by the statutes, and that his liability may extend to the occupant of oncoming vehicles. This is the specific difference between what I think the law is, and the pathway now taken by the majority. The majority now seem to determine that the slower driver does not have a duty to third parties even where his acts which contravene the statutes may cause another driver to act in a foreseeable manner which directly produces the resulting damage and injury.

*Sound of Horn*

A possible authority in Wyoming law which may have been considered is *Fink v. Lewark*, 70 Wyo. 150, 246 P.2d 195 (1952) (see also *Blakeman v. Gopp*, Wyo., 364 P.2d 986 (1961); and *Jack v. Browne*, Wyo., 410 P.2d 578 (1966)), which considered the effect of § 31-5-201(a) and (b) and denied liability of the following vehicle *to the passed vehicle* premised on the failure to sound the horn to announce his anticipated passing. This justification for escape from liability was not presented by appellee, and, in this case, can be simply answered by virtue of the acknowledged statement of

1. A comprehensive review of all aspects of documentary evidence would cause one to realistically disbelieve the continued statements of Simmons that the Barnes pickup followed him for "four miles." However, that is the status of the record made by Simmons by affidavit and deposition. It is highly unlikely that a tired and hungry drilling crew would stay behind a water truck for four miles on a dusty country road since the average speed relationship from the testimony of the parties would indicate an in-

tent of Barnes to go approximately 45 miles an hour, and the Simmons vehicle going various speeds whether uphill or downhill, but somewhere between 20 and 30 miles an hour. The record does not clearly define, but it is indicated that the Barnes vehicle had been on the Iberlin Road for substantially less than four miles. However, from the standpoint of England and summary judgment, he was entitled to take the testimony of Simmons at its sworn best or worst.

the driver Simmons that he *knew* that the following vehicle *intended* and *wanted to pass.* Consequently, the warning requirement of a horn has no relevant implication or application in the statutory obligation to give way to the passing vehicle. It will be strange indeed if this decision is realistically to be premised on a footnote statement of the court when the record reflects that the desire to pass was known so that any horn sounding (even if it would have been heard) had no proximate relevance to the failure to comply with the statute and give way to the right for the following vehicle.

As to the injured and innocent oncoming driver England, it really did not matter whether it was by sound of horn or other driver signal that Simmons knew Barnes wanted to pass. Simmons admitted knowing for a period of time that Barnes wanted to pass, and did nothing to comply with the statutory directive until the action he did take involved the foreseeable head-on collision between the other two vehicles then entering the zone of cause and effect.

The most recent and controlling authorities are *Checker Yellow Cab Co. v. Shiflett,* Wyo., 351 P.2d 660 (1960), and *Campbell v. W.S. Hatch Co.,* Wyo., 622 P.2d 944 (1981), which are directly in point on the horn-sounding, proximate-cause factor. Hornsounding is not "informative" or "imperative" if the overtaken vehicle knows that the rear vehicle exists and desires to pass. Absence of horn-sounding is not a justified basis for summary-judgment disposition in this case.

*Liability Recognizing Driving Responsibility*

Philosophically, consideration of these statutes affords an occasion also to recognize the corrective catharsis achieved when juries impose damages through their verdicts. Professor Thomas F. Lambert, Jr. principally addressed these people-problems as societal responsibilities and remedies in one of his landmark reviews in *Suing for Safety,* Trial, Vol. 19, No. 11, at 48 (November 1983):

"An error does not become a mistake unless you refuse to correct it.

\* \* \* \* \* \*

"Accident Prevention Is Better Than Accident Compensation: 'A Fence at the Top of the Cliff Is Better Than an Ambulance in the Valley Below.' A successful lawsuit and the pressures of stringent liability are one of the most effective means for cutting down on excessive preventable dangers in our risk-beleaguered society."

The fastest, simplest and best method of correcting unacceptable driver attitudes is to recognize destructive conduct by financial responsibility. Anyone who has spent significant time driving on Wyoming's occasionally dusty and frequently snowy roads, recognizes that bad manners and lack of assistance to following vehicles on the part of the first vehicle often create a hazard to the vehicle coming from the opposite direction. Normally one can see the first oncoming vehicle as it approaches, but not the second vehicle, the movements of which may have been authored by the careless driving of the person in front. In terms of cause and result, Simmons could only more directly have caused the England injury if he had driven his vehicle into the nearly stopped oncoming pickup.

I find a similarity to the deficiently moored boat in *Petition of Kinsman Transit Company,* 338 F.2d 708 (2d Cir.1964), cert. denied sub nom. *Continental Grain Co. v. City of Buffalo,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965), where the ship broke loose, hit another ship, and both then hit a bridge, damming the river and flooding plaintiff's riverside property.

" \* \* \* [A]n actor whose negligence has set a dangerous force in motion is not saved from liability for harm it has caused to innocent persons solely because another has negligently failed to take action that would have avoided this." 338 F.2d at 719.

" \* \* \* No one would dream of saying that a shipowner who 'knowingly and wilfully' failed to secure his ship at a pier on such a river 'would not have threat-

ened' persons and owners of property downstream in some manner. The shipowner and the wharfinger in this case having thus owed a duty of care to all within the reach of the ship's known destructive power, the impossibility of advance identification of the particular person who would be hurt is without legal consequence." 338 F.2d at 723–724.

" * * * [W]e would find it difficult to understand why one who had failed to use the care required to protect others in the light of expectable forces should be exonerated when the very risks that rendered his conduct negligent produced other and more serious consequences to such persons than were fairly foreseeable when he fell short of what the law demanded." 338 F.2d at 722–723.

## LEGAL CAUSE—PROXIMATE CAUSE FOR LIABILITY

The most important and challenging questions in tort law for this case involve issues of proximate cause, such as whether it is proper for jury decision to submit the question of England's recovery from Simmons for causing the head-on collision with Barnes. Vandall, *Judge Posner's Negligence-Efficiency Theory: A Critique*, 35 Emory L.J. 383, 404 (1986). This appellate court is called to ask if there is evidence in the case from which a jury could be entitled to determine that Simmons' conduct in driving the water truck justifies legal liability for the resulting injury to England. It seems clearly established by the Restatement of Law and general case law that foreseeability is not a factor of proximate cause but instead an element of causal negligence.

"The term 'proximate cause' is applied by the courts to those more or less undefined considerations which limit liability even where the fact of causation is clearly established. * * * ['Proximate'] is an unfortunate word, which places an entirely wrong emphasis upon the factor of physical or mechanical closeness. For this reason 'legal cause' or perhaps even

'responsible cause' would be a more appropriate term. * * *

\* \* \* \* \* \*

" * * * [T]wo contrasting theories of legal cause recur throughout the cases and account for most of the conflict with respect to the choice of a basic theory. One of these theories is that the scope of liability should ordinarily extend to but not beyond the scope of the 'foreseeable risks'—that is, the risks by reason of which the actor's conduct is held to be negligent. The second, contrasting, theory is that the scope of liability should ordinarily extend to but not beyond all 'direct' (or 'directly traceable') consequences and those indirect consequences that are foreseeable.

" * * * Another choice of theory concerns the question whether all limitations on the scope of liability of a negligent defendant—apart from defenses and, in some instances, requirements regarding the nature of the harm—will be dealt with under the rubric of 'legal cause' (or 'proximate cause') or instead some will be dealt with as issues of 'duty.' " Prosser and Keeton on The Law of Torts, Ch. 7, § 42 at 273–274.

" * * * It is simpler, and no doubt more accurate, to state the problem in terms of legal responsibility: is the defendant legally responsible to protect the plaintiff against such unforeseeable consequences of the defendant's own negligent acts? * * * As to this problem, there are two basic, fundamental, opposing and irreconcilable views, which have been in conflict for more than a century; and each has developed complications of its own. * *

"The first of these positions * * * [is] that the same criterion of foreseeability and risk of harm which determined whether the defendant was negligent in the first instance should determine the extent of the liability for that negligence; and that no defendant should ever be held liable for consequences which no reasonable person would expect to follow from the conduct. The limitation, in oth-

er words, is to foreseeable consequences, and liability is restricted to the scope of the original risk created, with the test of responsibility for the result identical with the test for negligence." Prosser and Keeton on The Law of Torts, supra, § 43 at 281.

"There remains the opposing view, which has been urged from time to time by a good many writers, that a defendant who is negligent must take existing circumstances as they are, and may be liable for consequences brought about by the defendant's acts, even though they were not reasonably to be anticipated. Or, as it is sometimes put, that what the defendant could foresee is important in determining whether the defendant was negligent in the first instance, but not at all decisive in determining the extent of the consequences for which, once negligent, the defendant will be liable." Id. at 290.

Whatever may be the conception of the Wyoming cases as currently reviewed, it is apparent that the final principle which defined the proper scope of appellate review in this case is then stated:

"Thus, in any case where there might be reasonable difference of opinion as to the foreseeability of a particular risk, the reasonableness of the defendant's conduct with respect to it, or the normal character of an intervening cause, the question is for the jury, subject of course to suitable instructions from the court as to the legal conclusion to be drawn as the issue is determined either way. By far the greater number of the cases which have arisen have been of this description; and to this extent it may properly be said that 'proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case.'" Prosser and Keeton on The Law of Torts, supra, § 45 at 321.

Support for this position can be found in the Restatement Second of the Law, Torts 2d:

"§ 430. Necessity of Adequate Causal Relation

"In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm."

"§ 431. What Constitutes Legal Cause

"The actor's negligent conduct is a legal cause of harm to another if

"(a) his conduct is a substantial factor in bringing about the harm, and

"(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

"§ 435. Foreseeability of Harm or Manner of Its Occurrence

"(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

"(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

This court, by affirming the summary-judgment decision for the defendant, resolved the issue by denying defendant's negligence as a matter of law upon the conflicting evidence. Proximate cause or legal cause devolving from concurrent or intervening events were not presented as a basis for the decision. However, if foreseeability or lack of cause in fact is to be denied, then liability to England does not exist, whether or not negligent driving is demonstrated.

The Wyoming proximate-cause cases, extensive in number, have a trend in uniformity as initially derived from the early opinion of Justice Blume in *Lemos v. Madden*, 28 Wyo. 1, 200 P. 791 (1921). See also *Equitable Life Assurance Society of the*

*United States v. Gratiot*, 45 Wyo. 1, 14 P.2d 438, 82 A.L.R. 1397 (1932); *O'Keefe v. Cheyenne Chamber of Commerce*, 56 Wyo. 170, 105 P.2d 279 (1940).[2] In one of his last opinions on the subject, Justice Blume included a well-reasoned quotation from Prosser on Torts at 324, involving the status of jury consideration:

> " 'If the defendant's conduct was a substantial factor in causing the plaintiff's loss, it follows that he will not be absolved from responsibility merely because other causes, such as the negligence of other persons, have contributed to the result.'

"If the original wrongdoer 'could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another.' Shearman & Redfield on Negligence, Rev.Ed., Section 38." *Phelps v. Woodward Construction Company*, 66 Wyo. 33, 204 P.2d 179, 187 (1949).

A valuable and comprehensive discussion of causation is to be found in Keeton, *Causation*, 28 S.Tex.L.J. 231 (1986), and is summarized at pp. 231–232:

> " * * * There are four elements in a claimant's prima facie case of negligence. These generally recognized elements are: (1) a duty of reasonable care, (2) a breach of that duty, (3) proximate causation, and (4) damages. An explanation of the terms duty and breach of duty is necessary to identify the issues underlying each of the elements and the problems

arising in connection with proximate cause.

> *        *        *        *        *        *

> "Generally, two elements are required to establish that the negligence of a defendant is the proximate cause of a plaintiff's injury: factual causation and legal causation. Factual causation refers to the requirement that the act and the injury be related. Legal causation refers to the requirement that the act and the injury be *reasonably* related."

In *Phelps v. Woodward*, supra, the court considered the liability of the utility for a shallow gas line later hit by a digging contractor. The jury-trial right was confirmed on appeal. If a gas pipe, inadequately buried and then negligently struck, can create a jury issue, so also the instant facts should similarly serve.

I postulate this dissent on a very simple inquiry: If a slow-moving vehicle fails to yield in violation of statutory driving responsibilities, and thereby causes a negligently passing vehicle to injure a third party, is a jury issue of liability created?

The court misplaces reliance on *Brockett v. Prater*, supra, 675 P.2d at 640, wherein the court said in general context:

> "Appellee's failure to stop after she saw the car run the stop sign was not negligence as a matter of law. In this case reasonable minds could differ as to who was negligent, the extent of that negligence, and whether it was a proximate cause of the accident. The jury, as fact finder, could properly choose to believe the testimony of appellee and that of the corroborating eyewitness and reject the opinion of appellant's expert. Upon the

**2.** Representative Wyoming cases on proximate cause or cause in fact include: *Zanetti Bus Lines, Inc. v. Hurd*, 320 F.2d 123 (10th Cir.1963); *Fiedler v. Steger*, Wyo., 713 P.2d 773 (1986); *Noonan v. Texaco Inc.*, Wyo., 713 P.2d 160 (1986); *State v. Dieringer*, Wyo., 708 P.2d 1 (1985); *Brockett v. Prater*, supra; *Beard v. Brown*, Wyo., 616 P.2d 726 (1980); *Timmons v. Reid*, Wyo., 569 P.2d 112 (1977); *Bluejacket v. Kearney*, Wyo., 550 P.2d 494 (1976); *Gilliland v. Rhoads*, Wyo., 539 P.2d 1221 (1975); *Zanetti Bus Lines, Inc. v. Logan*, Wyo., 400 P.2d 482 (1965); *Checker Yellow Cab Co. v. Shiflett*, su-

pra; *McClanahan v. Woodward Construction Co.*, 77 Wyo. 362, 316 P.2d 337 (1957); *Chandler v. Dugan*, 70 Wyo. 439, 251 P.2d 580 (1952); *Fink v. Lewark*, supra; *Phelps v. Woodward Construction Company*, 66 Wyo. 33, 204 P.2d 179 (1949); *Gamet v. Beazley*, 62 Wyo. 1, 159 P.2d 916 (1945); *Bankers Life Co. v. Nelson*, 56 Wyo. 243, 108 P.2d 584 (1940), *reh. denied* 56 Wyo. 513, 111 P.2d 136 (1941); *O'Keefe v. Cheyenne Chamber of Commerce*, supra; *Life Assurance Society of the United States v. Gratiot*, supra; *Hester v. Coliseum Motor Co.*, 41 Wyo. 345, 285 P. 781 (1930); *Lemos v. Madden*, supra.

disputed facts and evidence, they could find that appellee was not guilty of negligence that proximately caused the accident."

The citation in that case as to the duty to anticipate conduct, *Gulf Oil Corp. v. Daniels,* Okl., 449 P.2d 884 (1969), relates to the relationship between the initial participants and not to responsibility to an innocent third party evolving from the mutual interaction of the first two. That court correctly ascribed the fact-finding function to the jury, and refused to rule as a matter of law. Citations and authority of concurrent negligence and third-party injury were not involved. See 1 Blashfield Automobile Law and Practice, § 53.8 at 392, and § 53.9 at 398.

> "Negligence of the driver of either the lead vehicle or a following vehicle can be ruled as a matter of law only where reasonable persons could not differ on that issue. Similarly, that such negligence constituted a proximate cause of a collision or injury may be ruled as a matter of law only where reasonable persons could not differ on that issue." 2 Blashfield Automobile Law and Practice, § 113.2 at 667.

See Annot., 100 A.L.R.2d 942, Foreseeability as an element of negligence and proximate cause.

In *Swearngin v. Sears Roebuck & Company,* 376 F.2d 637, 642 (10th Cir.1967), the Court of Appeals said:

> " ' * * * [I]t is generally held, regardless of whether the question of "foreseeability" is treated as a problem of "duty," "negligence," or "proximate cause," that it is not necessary that the defendant might or should have foreseen the likelihood of the particular injury or harm, the extent of the harm, or the manner in which it occurred, but that it is only necessary that he should have anticipated that some injury or harm might result from his conduct.' 100 A.L.R.2d 980; *Rowell v. City of Wichita,* 162 Kan. 294, 176 P.2d 590 (1947) and *Atherton v. Goodwin,* 163 Kan. 22, 180 P.2d 296 (1947) cited as authority."

See *City of Scottsdale v. Kokaska,* 17 Ariz. App. 120, 495 P.2d 1327 (1972); *Southern Bell Tel. & Tel. Co. v. Whiddon,* 108 Ga. App. 106, 132 S.E.2d 237 (1963); and *Rikstad v. Holmberg,* 76 Wash.2d 265, 456 P.2d 355 (1969). Cf. *Daniel v. Matthews,* 46 Ala.App. 568, 246 So.2d 457 (1971); *Polasek v. Quinius,* Tex.Civ.App., 438 S.W.2d 828 (1969).

I conclude that a factual conflict existed regarding the contendably negligent driving of Simmons. Consequently, that claim of negligence raises an issue of fact for jury decision for determination whether that negligence, if found, did constitute a legal cause of damages sustained by England. Otherwise the jury of society might come to again agree with Professor Lambert in his discussion about another aspect of tort liability, as paraphrased, that

> "The rule operated to deny recovery for perfectly foreseeable consequences of admitted negligence. It was bad morals * * * [bad driving], bad social engineering, and bad law, feeble in its rationale and inexcusably retrograde in the result." Lambert, *Touchstones of Tort Liability,* 33 American Trial Lawyers Journal 378, 388 (1970).

I would reverse and remand for trial.